### FRISCIA et al. v. UNITED STATES.
### No. 6740.

Circuit Court of Appeals, Fifth Circuit.
April 1, 1933.

Rehearing Denied April 21, 1933.

Howard P. Macfarlane, R. C. Brown, and Le Roy Allen, all of Tampa, Fla., and Warren Doyle, of New Orleans, La., for appellants.

W. P. Hughes, U. S. Atty., of Jacksonville, Fla., and Nathan R. Graham, Asst. U. S. Atty., of Tampa, Fla.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

BRYAN, Circuit Judge.

Appellants, Augustine Friscia, Peter Friscia, Mario Pearla, and Lewis Puglisi, were convicted, upon five counts of an indictment drawn under 18 USCA § 338, of using the mails for the purpose of executing a scheme to defraud.

The first count of the indictment—after setting out that on October 2, 1931, an apartment house described by lot and block numbers, the title to which was in Augustine Friscia, was destroyed by fire, and that before the fire a policy in the sum of $3,000, insuring the apartment house against loss by fire, was issued "by Associated Underwriters, Inc., a corporation under the laws of the state of Illinois, and an attorney in fact of Chicago Lloyds, an aggregation .of individuals not incorporated, insurers"—alleges that while the insurance policy was still in force appellants devised a scheme to obtain from the insurers the amount of the insurance by falsely pretending and representing that the fire which had destroyed the apartment house "was an accidental fire, and one concerning which, under their said insurance contract and policy, said insurers were then liable to pay that amount, when, as each of said defendants then and there well knew, said fire was not an accidental fire, but, as each of the said defendants then and there well knew, was one originated by acts, designs and procurements on the part of said defendants, and one concerning which said insurers then

were not and would not .be liable upon said contract and policy; which said money said defendants were thereupon to convert to their own use, according to said scheme and artifice, and said insurers thereby defrauded thereof." Finally it was alleged that on November 30, 1931, appellants, for the purpose of executing the fraudulent scheme, placed in the post office at Tampa, Fla., for delivery to the addressees a sworn statement and proof of loss addressed to Chicago Lloyds and Associated Underwriters, Inc., at Chicago, Ill.

The second count is identical with the first, except that it alleges the issuance of a $15,000 fire insurance policy on the same apartment house. The third and fourth counts are also in the same form, except that they allege the issuance of fire insurance policies for $3,000 and $15,000, respectively, on an adjoining apartment house, which it is alleged was burned on November 6, 1931. The fifth count had to do with a fire insurance policy for $4,000 upon household goods in the building described in the first count.

The assignments of error relate to: (1) The denial of a motion to quash the indictment, (2) an order overruling a demurrer to the indictment, (3) sufficiency of the evidence, (4) instructions given by the court to the jury, and (5) requests to charge which were refused.

The motion to quash alleges that the evidence before the grand jury was incompetent and based upon hearsay, and prays for permission to inspect the minutes kept by the grand jury. Supporting affidavits by Augustine Friscia and counsel are to the effect that in so far as they could ascertain the grand jury considered only the transcript of testimony given before the county solicitor of Hillsborough county, who made an investigation concerning the burning of the apartment houses, the testimony of a local insurance agent and another witness who only claimed to have knowledge of circumstances attending the burning of the buildings. The indictment was returned on February 24, 1932; but the motion to quash was not filed until April 18, 1932, the day the case was called for trial. The grounds of the demurrer are: (a) That the indictment fails to charge a scheme to obtain any definite sum of money, but on the contrary alleges that no money or other thing of value was to be obtained as a result of the scheme; and (b) that the indictment is fatally defective, because it does not give the names of the individual members of Chicago Lloyds, or state that their names were unknown.

It is undisputed that the lots on which the apartment houses stood were conveyed in June, 1931, to Augustine Friscia; that fire insurance policies were issued to expire in one year on the buildings in July and August, and on the household goods in September, all as set forth in the indictment; that the building described in the first and second counts was destroyed by fire on the night of October 2, and the other building on the night of November 6; that proofs of loss in which it was stated that the fires were of unknown origin were received through the mail by the insurers. The proofs of loss represented that each building was subject to a $7,000 mortgage, and copies of assignments of such purported mortgages from one Massari to one Siragusa, dated September 28, 1931, were introduced in evidence. The proof of loss relating to the building destroyed in the first fire identified it by street number, but also stated the lot and block numbers. A policy for $4,000 was also taken out on the household goods in the building which was destroyed by the second fire, but no proof of loss was submitted under it, doubtless for the reason that during the time which elapsed between the two fires that policy was canceled by the insurance company. There was testimony for appellants to the effect that in the year 1931 the reproduction value of each apartment building was between $18,000 and $21,000. Augustine Friscia took the stand and testified that he paid $5,000 for the two pieces of property. However, he admitted that he insured the buildings and arranged to have them burned for the purpose of collecting the insurance, and then in order to avoid suspicion went to New York before the first, and stayed there until after the second, fire. But he undertook to exonerate his codefendants by claiming that his confederate was one Gus Perez.

The evidence of participation in the scheme by each of the other appellants was as follows: Peter Friscia, Augustine's brother, was a lawyer. He too testified in his own behalf. He admitted that on the morning of October 3 he accompanied the fire marshal, at the latter's request, to the scene of the first fire which had occurred the night before; that they went into the building that had not then been burned, where he saw streamers of heavy brown paper tacked up and strung in the hallways and in almost every room in the building, detected the scent of gasoline on a mattress, and observed a big hole in the floor downstairs, where the fire had been put out, which had either been burned or "put there on purpose"; that he saw springs without beds or mattresses, and that afterwards he prepared proof of the loss from the first fire and submitted it to a firm of more experienced lawyers, who prepared it for mailing. A member of the firm of lawyers so consulted testified that this proof of loss was put in an envelope addressed to the insurers and returned to Peter Friscia, and that later he became suspicious of the entire transaction and told the Friscia brothers his firm refused to have anything further to do with the claims against the insurers. Peter Friscia further testified that after this interview, upon being assured by his brother Augustine that the latter was innocent of any wrongdoing and believed that the building had been burned by his enemies, he was convinced that his brother was telling him the truth, and therefore decided to handle by himself all further matters connected with the collection of the insurance. Peter Friscia made this profession of his own innocence and good faith notwithstanding his admission that before the fire he told his brother that the latter had made a bad investment, and notwithstanding also his statement that after the first fire he and his father employed appellant Puglisi to continue to watch over and take care of the apartment houses. After the second fire he prepared proofs of loss on the other building, but did not mail them; instead they were mailed to the home office by the local agents with whom he left them. Other evidence for the government tended to prove that Peter Friscia in making up proof of loss of household goods was instrumental in procuring from Gus Perez, a furniture dealer, a bill evidencing a sale for $10,400 of household goods that had been bought from him and placed in the apartments; and that he tried to arrange for Perez to accept a note for $4,000 in order to satisfy the insurance company that the furniture placed in the building first burned had cost $5,200, or half of the total cost; and that these things were done because Augustine Friscia was able to produce canceled checks to Perez for only $1,200, which Perez testified was all that was ever charged or paid for the furniture. Pearla was in charge of the apartments. There was only one tenant in one building, and none in the other. Two or three days before the first fire he prevailed upon this tenant to vacate, saying that he wanted her rooms for himself, and offered to lend her $20 with which to pay for moving. He was active in the purchase of furniture from Perez, and delivery of it was completed upon his insistence on the very night of the first fire. He also tried to persuade Perez to accept a note for $4,000 so as to make it falsely appear to

980

the insurance company that the furniture which had been destroyed cost $5,200. One Michelle testified that after the first fire he was assigned by the sheriff to watch the other apartment; that on the day of the second fire ·Pearla paid him $500 not to interfere with the people who he said would come to burn it. Puglisi was caretaker of the apartments. He was identified as the man who, two or three days before the first fire, bought ten rolls of paper of the same kind as was tacked up in the apartment which 'was not burned by that fire. Michelle, the watchman who claimed he was bribed, testified he saw Puglisi running away from that building by the light of the second fire which destroyed it.

The instructions given by the court to the jury, to which appellants excepted, were that when two or more persons enter into an unlawful scheme, the acts and statements of each in furtherance of the common plan may be considered against all; that one who aids or abets in the commission of an offense is equally guilty with the principal; and that "it is your duty in arriving at your verdict to consider the evidence as it bears upon the guilt or innocence of each individual defendant, and if the evidence against any defendant fails to convince you of his guilt of the charge made in any count of the indictment beyond and to the exclusion of every reasonable doubt, then it is your duty to find such defendant not guilty as to such count." In commenting on the evidence the court called attention to the fact that Siragusa had not appeared to testify concerning his apparent interest as mortgagee in the insurance, and said that the reason why the mortgages for $14,000 had been placed on the property, was a question which the jury would have to determine from their knowledge of human affairs.

The court refused to charge the jury as requested that all the defendants, except those who mailed the proofs of loss, or had knowledge of the mailing thereof, or consented thereto, should be acquitted; and that if the jury had a reasonable doubt whether the participation of any defendant in the transactions involved in any count of the indictment was with guilty or fraudulent intent, it was their duty to acquit that particular defendant of the crime charged in such count.

As a general rule an indictment will not be quashed on the ground of insufficiency of evidence if the grand jury had before it some witnesses or some documentary evidence,· unless it be made affirmatively to appear that there was no competent evidence whatever in support of a true bill. 31 C. J. 808; Grace v. United States (C. C. A.) 4 F.(2d) 658. The motion to quash was itself based on surmise and speculation. It does not attempt to assert positively that no competent evidence was submitted to the grand jury, and for all that appears the two witnesses, who it is admitted gave testimony, were able to show probable cause. It was the duty of appellants to apply to have the indictment set aside promptly upon learning of anything that would vitiate it. It does not appear when they made their investigation, and it is consistent with the showing made that they acquired such information as they possessed long before the day of trial. At any rate, they failed to meet the burden of acting with that promptness and diligence in making their application which the law requires. Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624.

The first ground of the demurrer is without merit, since the indictment in each count plainly charges that appellants' plan was to obtain the exact amount named in each insurance policy. The indictment nowhere alleges, as claimed, that the scheme did not contemplate the procurement of money, although it is alleged that appellants knew there would be no liability upon the insurers for the payment of money. The whole scheme was to obtain money by false and fraudulent pretenses and representations. The other ground of the demurrer attacks the indictment for failing to give the names of the individual members ·of Chicago Lloyds, the insurers, or to allege that their names were unknown. The gist of this offense is the unlawful use of the mails. The names of the insurers were material only for the purposes of identifying the scheme and of furnishing information to the appellants in order that they might be enabled to prepare their defense and to avoid a second prosecution. It was impossible, because of the omission complained of, that they were or can hereafter be prejudiced or affected in their substantial rights. And so they have no cause for complaint here founded on the order overruling their demurrer to the indictment. 28 USCA § 391.

As to the evidence: It is contended in behalf of all the appellants that there was a fatal variance, in that the indictment alleged a scheme to.represent that the fire was accidental, whereas the representation made by the proofs of loss was that the fire was of unknown origin. Even so, it cannot be denied that the fire was represented as being accidental in so far as appellants were con-

cerned. The indictment also alleges that appellants planned to represent that the fire was one concerning which the insurers were liable to pay the amount of the insurance, although in reality the fire was one for which the insurers were not liable. There was no variance between the allegation and the proof as to this last-named object of the scheme. Where several separate objects, either of a scheme to defraud or of a conspiracy, are alleged, in our opinion it is not a good objection that the indictment charges more than was or could be proven, if what is well alleged constitutes an offense. Bailey v. United States (C. C. A.) 5 F.(2d) 437; Sasser v. United States (C. C. A.) 29 F.(2d) 76; Christiansen v. United States (C. C. A.) 52 F.(2d) 950; Horwitz v. United States, 63 F.(2d) 706, (February 20, 1933). The evidence leaves no doubt that the insurers were called upon to pay for losses for which they were not liable. A variance is also asserted because the first count of the indictment described the building destroyed in the first fire by lot and block numbers, and the proof of loss, as it is said, referred to it by street number. There cannot possibly be any merit in the point, since the proof of loss also identified the building by lot and block numbers, and there is no contention that either description was incorrect.

■ It is necessary to consider further only the sufficiency of the evidence relating to the first count of the indictment, as the sentences were not greater than could have been imposed under that count. It therefore becomes immaterial whether, as appellants contend, the proof of mailing as alleged in the other counts was inadequate. Augustine Friscia was guilty as charged by his own confession made during the trial.

■ There was evidence enough against Peter Friscia to justify his conviction. He says he came into the scheme innocently, and after the first fire. He came in early enough; for the indictment was so drawn as to make the scheme, not one to burn the buildings, but one to collect the insurance. Whether he came into the scheme innocently or not was for the jury to decide. The only fair inference from the testimony is that he mailed the first proof of loss. His protestations of innocence are largely overcome by his admissions that in his opinion his brother Augustine's investment was a poor one, and that he observed every evidence that the first fire was of incendiary origin, and notwithstanding all this that he afterwards made up proofs of loss in support of claims for insurance on both buildings and on the household goods. The jury were authorized to find that he attempted by false evidence to misrepresent the value of the household goods, and that he was instrumental in continuing Puglisi as watchman for the purpose of facilitating the burning of the apartment house which escaped destruction in the first fire. The evidence against Pearla all points to his guilt. His insistence that the only tenant should move out immediately and his anxiety that bed springs should be placed in both apartments and thus furnish silent proof in support of the claim that the buildings were furnished, and his alleged bribery of Michelle, were all circumstances inconsistent with innocence. The connection of Puglisi, the caretaker, with the first fire could reasonably be inferred from the circumstances that he bought the rolls of paper and that they could not have been tacked up in the apartments without his knowledge. Evidence that he was seen running away from the second fire tended further to prove that he was a party to the scheme from the beginning.

■ We see no error in the charge of the trial court that, partnership in crime being established against all the appellants, the act of any one of them in furtherance of the common plan is the act of all. Davis v. United States (C. C. A.) 12 F.(2d) 253; Sasser v. United States (C. C. A.) 29 F.(2d) 76. The charge that one who aids and abets in the commission of an offense is a principal was correct. 18 USCA § 550. The trial court was within its rights in commenting on Siragusa's failure to appear and testify concerning any interest he had in the mortgages that appeared against the property. Apparently it was the government's position that Siragusa was a fictitious person; if he were a real person it was easily within the power of Augustine Friscia to produce him. The first request of appellants, to the effect that only those who actually mailed proofs of loss, or had knowledge of, or consented to the mailing thereof, could be convicted and that the others should be acquitted, is disposed of by what we have already said in considering the charges given by the court of its own motion. So long as the act of a coconspirator, or a coschemer, or a copartner in crime, is in furtherance of a common criminal plan, such act is in our opinion admissible against all the defendants. The requested charge could only apply in this case to Pearla and Puglisi. By entering into the scheme they undoubtedly contemplated that any act necessary or appropriate to collect the insurance would be taken. The mailing of proofs was

surely such an act, for without proof of loss payment of the insurance could not reasonably have been expected. The last-requested charge was designed to present to the jury the question whether Peter Friscia's participation in the scheme was with guilty or fraudulent intent. That request was sufficiently covered by the court's charge above quoted, which directed the jury to consider the evidence as it bore separately upon the guilt or innocence of each individual defendant.

Reversible error is not made to appear by any of the assignments, and the judgment is affirmed.