**UNITED STATES v. REMINGTON.**
**No. 60, Docket 22790.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 1953.

Decided Nov. 24, 1953.

Writ of Certiorari Denied
Feb. 8, 1954.

See 74 S.Ct. 476.

————◆————

Joseph L. Rauh, Jr., Washington, D. C., Richard G. Green, New York City, and Daniel H. Pollitt, Washington, D. C., for William Walter Remington, appellant.

J. Edward Lumbard, U. S. Atty., Washington, D. C. (James B. Kilsheimer, III, Asst. U. S. Atty., New York City, of counsel), for United States, appellee.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In May 1950, William Remington was called before a federal grand jury for the Southern District of New York which was investigating possible violations of the espionage laws. While testifying before the grand jury, Remington denied that he at any time had ever been a member of the Communist Party. The grand jury returned an indictment for perjury against Remington on the basis of this denial. In the trial following, a verdict of guilty was rendered by the jury but on appeal we reversed the conviction and remanded the case for a new trial because of error committed in the charge to the jury. 2 Cir., 191 F.2d 246, certiorari denied, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325. On appeal in that case Remington had also charged that there had been improprieties in the grand jury proceedings which should have forced the indictment to be quashed. We did not pass on the sufficiency of those charges of misconduct on that appeal but ordered the testimony before the grand jury of Remington and his wife be made available to Remington at the new trial.

The government, instead of continuing under the original indictment by going forward with a new trial, obtained a new or second indictment from the grand jury. This indictment, dated October 25, 1951, charged Remington with giving perjured testimony in his defense to the original indictment in the first trial. Specifically five counts were involved: (1) denial of attendance at Communist Party meetings; (2) denial of delivery to Miss Bentley of information to which she was not entitled; (3) denial that he had ever paid Communist Party dues; (4) denial that he had ever solicited members for the Communist Party; (5) denial that he had any knowledge of the existence of the Young Communist League at Dartmouth College where he had been a student from 1934 to 1939. Remington was convicted on counts two and five, acquitted on count four, and the jury was unable to agree on counts one and three.

On appeal from this judgment of conviction the defendant Remington does not allege that any error was committed in the second trial under the new indictment and it is clear from the record that Judge Leibell conducted the trial with great care. However, the defendant has presented us with a rather new and novel argument in his demand for reversal of his conviction and dismissal of the indictment. It is charged that misconduct in the first grand jury proceedings by the government and the foreman of the jury and, further, an alleged concealment by the government during the course of the first trial of evidence of this misconduct, should force the first indictment to be quashed and that trial be declared a nullity. Moreover, if the first indictment and trial was the result of illegal conduct on the part of the government, it is argued that under the theory advanced in Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307, any fruits procured by this illegal conduct should be denied the government. Since Remington would never have been put on the stand in defense of the first perjury indictment but for the

procurement of that indictment by illegal conduct of the government, it is said that the government should not be permitted to bring a new indictment as a result of perjured statements made by Remington in his defense, and thus gain a benefit from its illegal conduct. In short Remington in effect urges that perjurious statements made at a trial under an illegally procured indictment cannot be subsequently prosecuted.

This argument of course assumes that there is sufficient evidence of misconduct in the grand jury proceedings to support a motion to quash that indictment. While we need not decide this question in view of our disposition of the appeal, it should be noted in passing that it is far from clear that the minutes of the first grand jury proceeding support a charge of "undue influence" sufficient to make the first indictment illegal. 2 Cir., 191 F.2d 246, 252.

█ Assuming without deciding that the first indictment is bad because of misconduct in the grand jury proceedings, we can find no authority to support the defendant's argument that perjury committed in a trial under a bad indictment cannot be prosecuted. Indeed, the opinion of the Supreme Court in United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 741, would seem to indicate otherwise. There Williams was indicted and convicted for perjury committed in a former criminal trial for conspiracy under the Civil Rights Acts. A conviction in the former trial was reversed and the indictment quashed on the ground that the indictment did not state an offense under the laws of the United States. United States v. Williams, 5 Cir., 179 F.2d 644, affirmed 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758. To the argument that the court in the first trial did not have jurisdiction and thus was not a "competent tribunal" within the meaning of the perjury statute, 18 U.S.C. § 1621, the Court stated: "Where a federal court has power, as here, to proceed to a determination on the merits, that is jurisdiction of the proceedings. The District Court has such jurisdiction. Though the trial court or an appellate court may conclude that the statute is wholly unconsitutional, or that the facts stated in the indictment do not constitute a crime or are not proven, it has proceeded with jurisdiction and false testimony before it under oath is perjury." 341 U.S. 58, 68–69, 71 S.Ct. 601. Likewise, in the prosecution under the indictment here, the court had jurisdiction over the crime and the defendant, the defendant was under oath to speak the truth, and could not, in our eyes, lie with impunity.

█ True, the instant case is distinguishable since here the previous indictment and trial is attacked because of government misconduct. The defendant seeks to make use of this distinguishing feature by introducing the doctrines outlined in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307, and Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, that "* * * knowledge gained by the Government's own wrong cannot be used by it * * *." 251 U.S. 385, 392, 40 S.Ct. 183. In the Nardone case judgment of conviction was reversed on the ground that the government could not use evidence of guilt procured through leads developed from knowledge gained by illegal wiretapping. Such evidence was fruit of the forbidden tree. Likewise in the Silverthorne case, Mr. Justice Holmes reversed a judgment of contempt for refusal to obey a subpoena where the government sought to secure evidence, the whereabouts and knowledge of which they had secured through an admittedly illegal search and seizure. The rationale behind these decisions is that to rigidly enforce due process protections we must deny any or all benefits to the government in its prosecution which can be proven to have resulted from the illegal conduct. In reversing the conviction in the Nardone case the Court said: "Once [illegal wire-tapping] is established * * * the trial judge must give oppor-

tunity * * * to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." 308 U.S. 338, 341, 60 S.Ct. 268. We do not see how this theory can be applied in the present case. Here we have a separate crime of perjury committed after the illegal conduct by the government as opposed to the above cases where we had only a rule of evidence developed to prevent the government from making use of its illegally procured knowledge. It seems to us an unwarranted extension of that doctrine to apply it here to a new wrong committed by the defendant. Moreover, to call the perjury a fruit of the government's conduct here, is to assume that a defendant will perjure himself in his defense. It is difficult to see any causal relation otherwise between the government's wrong and the defendant's act of perjury during the trial. If this assumption is a premise of the defendant's argument, we cannot accept it for it involves a disregard of the defendant's oath and an assumption that perjury, although a crime, is an inevitable occurrence in judicial proceedings.

It is argued that Remington would never have been in court but for the illegally procured indictment and that to preserve his rights and to rigidly supervise the federal enforcement of our laws, we must deny the government the right to prosecute here. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. However, supervisory rules concerning speedy arraignment and wire-tapping deal with the admission of evidence directly relating to a government wrong in investigating a past crime. They do not permit the defendant to commit a new and independent crime. We do not preserve justice by allowing further criminal activity to take place. Moreover, as a penalty placed upon the prosecution designed to prevent misconduct in the future, a re-versal here would serve no purpose. It cannot be conceived that the government would deliberately procure a false indictment in the hope of later obtaining perjurious statements at the trial. Such statements could more easily be procured in a new grand jury proceeding.

The doctrine of entrapment has been advanced to support the defendant's position but it is not applicable here. The defense of entrapment has been defined as follows: "When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor." Sorrells v. United States, 287 U.S. 435, 445, 53 S. Ct. 210, 214, 77 L.Ed. 413. If we say the government originated the criminal design here, the defense of entrapment would be available in every case of perjury where the government questions a defendant. When a defendant is questioned about his illicit activities or a crime, he may lie to save himself but we cannot make him immune from prosecution for perjury solely because the government asked him the questions or put him in a position where he would be asked questions.

The doctrine of entrapment has only the most superficial applicability here. Remington was indicted by a grand jury for committing perjury before it. Instead of attacking the indictment for illegality he chose to lie in his defense, as the jury below found. As a result, he was reindicted and now stands convicted of perjury independent from his initial perjury. Remington has been entrapped, not by devious means and methods employed by the government, but by his own acts. He is caught in a web of his own duplicity and zealous prosecution by the government. We should not overturn his conviction where his guilt is clear and to do so would not serve to rigidly enforce a defendant's constitu-

tional rights or prevent government misconduct in the future, but only to weaken our judicial process.

Judgment of conviction affirmed.

L. HAND, Circuit Judge (dissenting).

I agree that under United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747, the second indictment gave the District Court jurisdiction to try a perjury committed upon the trial of the first indictment; but that seems to me irrelevant. I do not understand that Remington disputes the court's jurisdiction; his argument is that the prosecution was guilty of such misconduct in procuring the first indictment that, not only could it not prosecute that charge, but that its misconduct protected any testimony given on the first trial from independent accusation. Whether that be right or wrong, I cannot see that United States v. Williams, supra, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747, touches it at all. The situation in outline was this. The grand jury was conducting an inquiry into putative espionage activities of Remington and others, in which he and his wife, Ann, both testified at length, as well as a good many others. Brunini was the foreman of the jury and Donegan was the government attorney in charge. The jury found no indictment for espionage, but it did indict Remington for perjury in testifying in the same proceeding that he had never been a member of the Communist Party. Upon the trial of that indictment Remington made the five statements that became counts for perjury in the second indictment, and upon two of these he was convicted. Neither of them was that he had never been a member of the Communist Party; but all five were relevant to that charge. After our reversal of his conviction under the first indictment, the prosecution did not move it on for another trial; and it still stands undisposed of, the Supreme Court having refused to allow the prosecution to withdraw it. Another grand jury found the second indictment, based, as I have just said, upon alleged perjuries committed on the trial of the first; and, so far as appears, there were no irregularities in the proceeding that resulted in this indictment; nor does Remington seek to reverse the conviction under it because of anything that took place on the second trial. The questions, as I see them, are: (1) whether any misconduct of Donegan and Brunini at the grand jury proceeding that led to the first indictment made it subject to quashal; and (2) whether, if so, Remington could be convicted for testimony upon the trial of that indictment.

The most vulnerable feature of the grand jury proceeding that resulted in the first indictment was the treatment of Remington's wife, Ann, during her testimony early in the inquiry and before Remington had himself testified. She was questioned continuously for about four hours and was obviously reluctant to disclose what she knew of her husband's connection with the Communist Party, and of his dealings with Elizabeth Bentley while she had been a Communist. The inquiry was particularly directed to what information, if any, Remington had given Miss Bentley, and, even more especially, to whether he had paid her his party dues. Ann Remington had very frankly given as her reason for not wishing to testify that her husband's conviction would imperil the support he gave her and her children; and it was this unwillingness that caused the pressure that was put upon her. It is impossible to appraise whether the examination as a whole went beyond tolerable limits without reading all her testimony up to the point where she broke down and finally admitted that Remington did "give this money to the Communist Party." After that she became generally complaisant, and gave testimony exceedingly damaging to him. However, I agree that, when faced with a patently unwilling witness, the grand jury was free to press her cross-examination hard and sharp; truth is more important than the sensibilities of the witness. Moreover, people will always differ as to the point where legitimate pressure ends

and improper coercion begins. I can only say that for myself the examination went beyond what I deem permissible. Pages on pages of lecturing repeatedly preceded a question; statements of what the prosecution already knew, and of how idle it was for the witness to hold back what she could contribute; occasional reminders that she could be punished for perjury; all were scattered throughout. Still she withstood the examiners, until, being much tried and worn, she said: "I am getting fuzzy. I haven't eaten since a long time ago and I don't think I am going to be very coherent from now on. I would like to postpone the hearings. * * * I want to consult my lawyers and see how deep I am getting in." This was denied, and the questioning kept on until she finally refused to answer, excusing herself because she was "tired," and "would like to get something to eat. * * * Is this the third degree, waiting until I get hungry, now?" Still the examiners persisted, disregarding this further protest: "I would like to get something to eat. But couldn't we continue another day? Or do I have to come back?" Thereupon there took place what I quote in the margin,[1] and what proved to be the *coup de grace*, after which she made a full disclosure of what she knew: a very large part of it what Remington had told her during their marriage and before they separated in January 1947.

Even though the testimony so extracted had not so largely consisted of privileged communications, I should have hesitated a long time before I let an indictment stand that depended upon it. Especially important is the fact that the

1. *By Mr. Donegan:*

Q. Well, do we have to go through all this background? We are right down to the issue right now, after all this time we have just reached the question now. Why not answer that question, and then we'll postpone it for another day; if you answer that question, we'll postpone it for another day. That isn't going to involve you, is it? It couldn't involve you. All you have to do is say yes or no as to whether that money was for the Communist Party. And your yes or no isn't going to decide the issue, I'll tell you that; it's something else that exists. You know that I wouldn't ask you questions—you can't accuse me of fishing in here. I haven't learned anything yet. A. Well, I don't want to answer.

*By the Foreman:*

Q. Mrs. Remington, I think that we have been very kind and considerate. We haven't raised our voices and we haven't shown our teeth, have we? Maybe you don't know about our teeth. A witness before a Grand Jury hasn't the privilege of refusing to answer a question. You see, we haven't told you that, so far. You have been asked a question. You must answer it. If a witness doesn't answer a question, the Grand Jury has rather unusual powers along that line. We are, to a certain extent, what you might call a judicial body. We can't act, ourselves. Our procedure is, when we get a witness who is contemptuous, who refuses to answer questions, to take them before a Judge. Now, at that point there will be a private proceeding. He will instruct the witness to answer the question. Then we come back here and put the question again. If the witness refuses to answer the question, we take him back to Court and the Judge will find him in contempt of Court and sentence him to jail until he has purged himself. "Purging," in that case, is answering the question. Now, I have already pointed out to you that you have a question from the Special Assistant to the Attorney General: Did your husband or did he not give this money to the Communist Party? You have no privilege to refuse to answer the question. I don't want at this time to—I said "showing teeth." I don't want them to bite you. But I do want you to know that. And remember, you have a very sympathetic body here. We want to avoid anything like that. I didn't mention, of course, the second proceeding before a jury is of course a public hearing. And I mention that to you in fairness because I do know that you have a certain grave concern about what your obligations are, and I think in fairness to you we should tell you that. And in view of the time and, I think, the empty stomachs of all the Jurors—I know mine is very empty—I think we can very quickly dispose of things if you will just proceed now. I think you have in your heart answered the questions as to what your procedure should be. (To Mr. Donegan) Do you want to put the question again?

Q. Can you find that question, Mr. Reporter? A. My answer is yes.

examination was *ex parte* and without the presence and control of a judge or any other impartial official, to pass upon objections made by an opposite party, or intervene *ex proprio motu* to protect the witness. The privilege against self-incrimination itself arose because of the abuses of the "ex officio examination" in the 17th century in the Star Chamber and the Ecclesiastical Commission,[2] where there was no judge, and which was *in camera* after the model of the Holy Office itself. Save for torture, it would be hard to find a more effective tool of tyranny than the power of unlimited and unchecked *ex parte* examination. Beginning with McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819, and ending with Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, the Supreme Court has shown itself extremely sensitive to the opportunities for oppression that such examination offers; and the present time is hardly a propitious season to abate that vigilance. It is true that the decisions I mention were all, I think, occasions on which the evidence excluded was obtained from a person charged with crime; but I cannot see that that is relevant, except perhaps in point of degree. The notion that evidence forced from a witness shall not be used originally depended, or was said to depend, upon the likelihood that it might be false. That was especially the ground for refusing an uncorroborated confession as enough support for a conviction; just as it was the doctrine of the Roman, and of the Canon, law that evidence extracted by torture must be corroborated. I do not suggest that that may not still be one ground in situations like this; but whatever may be the reasonable doubts as to the credibility of evidence so procured, the decisions also rest upon a quite different consideration. When the question arises in a prosecution for crime, the courts regard the prosecutors as parties to the controversy and will not allow them to use the fruits of their own wrongs. It is as though there were a carry-over from the civil maxim: *ex turpi causa non oritur actio.*

However, I shall assume for argument that, had there been nothing more than I have mentioned, the indictment might have stood up. It is the added circumstance that, as I have already said, a very large part of Ann Remington's testimony consisted of confidential communications from her husband to her, that satisfies any doubts I might otherwise have had. That was testimony as much privileged in a federal court,[3] as in a state court; moreover, the privilege extends to a proceeding before a grand jury.[4] Although I have found no federal decisions, I accept it also as the law that her later separation and divorce from Remington did not open the witness's mouth;[5] indeed, any other view would be completely inconsistent with the theory of the privilege. It will have been observed how important a part this played in the result, for in his final admonition that effected her breakdown, Brunini not only threatened her with contempt proceedings, but expressly told her that she had no privilege. His language is worth repeating: "Now, I have already pointed out to you that you have a question from the Special Assistant to the Attorney General: Did your husband or did he not give this money to the Communist Party? *You have no privilege to refuse to answer the question.*" Read literally, that was true; but, read as the witness must have understood it— that is, whether her husband had not told her so—it was altogether false. I do not intimate that Brunini, a layman, thought it false; but Donegan was present, and he did not intervene to correct the mistake.

I shall not consider the other alleged irregularities in the proceeding of the grand jury, because what I have recited would alone in my judgment have re-

---

2. Wigmore, § 2250.

3. Wolfle v. United States, 291 U.S. 7, 54 S. Ct. 279, 78 L.Ed. 617.

4. Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306.

5. Wigmore, § 2341.

quired the indictment to be quashed, had the case gone back for a new trial. In saying so, I do not forget that there was other testimony adequate to support the charge that Remington had sworn falsely when he said that he had never been a member of the Communist Party; or that, in those not very numerous instances in which courts have considered the admission of incompetent evidence before a grand jury, they have held pretty generally, though not uniformly, that the indictment will stand, provided that the jury had before it other adequate competent evidence to support the charge.[6] This has been the rule, in spite of the obvious fact that the same reasoning by which courts upset the verdict of a trial jury, applies as much to the finding of an indictment: i. e., the incompetent evidence may have furnished the makeweight that turned the scale. The answer has ordinarily been that a grand jury need only be satisfied that there is reasonable ground to suppose the accused guilty;[7] and that an indictment is only an accusation, which must be followed by a trial at which all incompetent evidence will be winnowed out. Even as *res integra*, I should think the same. There are so few occasions when it is possible for the accused to get access to the proceedings of a grand jury, that an opposite rule would at best work capriciously; and in any event the answer depends upon whether the hindrance to the effective punishment of crime by allowing the accused to pick over the evidence does not outweigh any injustice he may suffer, if that privilege be denied him. But I am convinced that this rule should not excuse oppression and deceit in procuring the indictment. The postulate on which the exclusion of such testimony depends, must be that only by upsetting convictions so obtained can the ardor of prosecuting officials be kept within legal bounds and justice be secured; for in modern times all prosecution is in the hands of officials. It was not so in ancient times when a private person might appear before a grand jury and present his grievance, and when the initiative in criminal prosecution depended for the most part upon the victim's desire to retaliate. Whether or not that was ever an adequate check upon official misconduct, it no longer exists; and, as officials are for all practical purposes immune from any sanctions, the situation seems to me to justify invoking the principle that, when it is doubtful how far the consequences of a wrong have gone, the burden is on the wrongdoer to prove what they actually were. Hence it would follow here that, since the prosecution did not, and could not, show whether Ann Remington's testimony turned the scale, the first indictment could have been quashed—a point that, incidentally, we left open on the first appeal.

It was to escape this risk that that indictment was abandoned; but I do not believe that by this device a prosecution should escape the consequences of its wrong. For that conclusion I rely upon the doctrines laid down in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, and Sorrels v. United States, 287 U.S. 435, 53

6. Holt v. United States, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021; McGregor v. United States, 4 Cir., 134 F. 187, 192, 193; Chadwick v. United States, 6 Cir., 141 F. 225, 235; McKinney v. United States, 8 Cir., 199 F. 25, 28, 29; Anderson v. United States, 8 Cir., 273 F. 20, 29; Murdick v. United States, 8 Cir., 15 F.2d 965, 967, 968; Olmstead v. United States, 9 Cir., 19 F.2d 842, 845, 53 A.L. R. 1472; Kastel v. United States, 2 Cir., 23 F.2d 156, 158; Friscia v. United States, 5 Cir., 63 F.2d 977, 980; Wiggins v. United States, 9 Cir., 64 F.2d 950, 952; Tinkoff v. United States, 7 Cir., 86 F.2d 868, 877.

7. Beavers v. Henkel, 194 U.S. 73, 85, 24 S.Ct. 605, 48 L.Ed. 882; Ewing v. Mytinger & Casselberry, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088; Respublica v. Shaffer, 1 Dall. 236, 1 L.Ed. 116; Shushan v. U. S., 5 Cir., 117 F.2d 110, 113, 133 A.L.R. 1040; U. S. v. Direct Sales Co., D.C.S.C., 40 F.Supp. 917.

The variant introduced by Field, J., in his Charge to the Grand Jury, Fed.Cas. No.18,255, has never taken root and may be disregarded.

S.Ct. 210, 77 L.Ed. 413, both of which, though challenged at the time, have now fully established themselves as a part of federal criminal law. The doctrine of the first of these—that the prosecution may not use evidence that it has unlawfully obtained—must depend, I suggest, upon the premise that the gathering of evidence is a step in the procedure for the punishment of crime; and that to gather it unlawfully is as much a denial of a part of that procedure as would be the denial of any formally prescribed step. Now the finding of the first indictment was a necessary part of the evidence in the case at bar, because without it nothing that Remington said in the first trial would have been perjury, no matter how false it was. I do not see any difference in principle between obtaining the first indictment by the unlawful extraction of evidence, necessary to its support, and obtaining a document by an unreasonable search. Surely this would not be denied in an extreme situation: as, for example, if the prosecution had suborned the witnesses, or threatened to prosecute them, if they did not swear as directed. Coming next to the doctrine of Sorrels v. United States, supra, which makes "entrapment" a defence, it depends, as I understand it, upon the repugnance of decent people at allowing officials to punish a man for conduct that they have "incited" or "instigated," and to which by so doing they have made themselves accessories. Now it is of course true that by finding the first indictment and bringing it on for trial, those responsible for doing so did not "incite" or "instigate" Remington to repeat on the first trial the testimony that he had given on the grand jury proceeding; and I agree that, if that express relation to the crime is essential to the defence, it did not exist here. But I do not think that the doctrine should be so narrowly confined. Having committed himself upon the grand jury proceeding to a denial of his membership in the Communist Party, Remington at the trial of the indictment based upon that denial, could not escape repeating what he had said, for, if he did not take the stand, it would have been equivalent to a plea of guilty. Therefore, I do not see how it can be denied that the finding of the first indictment was as direct a provocation of the perjury for which he has been convicted, as the persuasion of agents or officials of the prosecution would have been, had they "incited" or "instigated" him to perjure himself; so that in point of causation I insist that the situations are the same. And so the question comes down to whether there is any difference between the repugnance that decent people would feel at punishing a man for perjury that the officials or their agents persuaded him to commit, and the repugnance they would feel if the officials induced him to perjure himself by securing an indictment for perjury against him by illegal means, when they knew he must inevitably repeat the perjury in his defence. Again, as I said a moment ago, if the indictment had been obtained by subornation of the witnesses, or by threats of their imprisonment, I cannot believe that ordinary people would draw any distinction. In any case I should not so long as the unlawful means were such that, if they had been disclosed, they would have resulted in a dismissal of the indictment and would therefore have removed the compulsion that induced the crime. For these reasons it seems to me that the case at bar is within the implied ambit of the doctrine of "entrapment" as well as it is within that of the doctrine against using evidence unlawfully obtained.

I think that the conviction should be reversed, and the indictment dismissed.