UNITED STATES of America, Appellee,

v.

Richard CIAMBRONE,
Defendant-Appellant.

No. 354, Docket 78–1235.

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1978.

Decided May 15, 1979.

Guy L. Heinemann, New York City (Edward M. Chikofsky, Heinemann & Chikofsky, New York City, of counsel), for defendant-appellant.

Mary McGowan Davis, Asst. U. S. Atty., Brooklyn, N.Y. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, Brooklyn, N.Y., of counsel), for appellee.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Richard C. Ciambrone appeals from a judgment of the Eastern District of New York entered on May 8, 1978, convicting him of three counts of an indictment charging him with making false declarations under oath in violation of 18 U.S.C. § 1623(a)[1] when he testified in December 1976 as a witness in a criminal case before the same court in a case entitled *United States v. Harry Blasich*, No. 76 Cr. 536.

Ciambrone was convicted after a jury trial before Judge Thomas C. Platt. His principal contentions here are that the indictment against him should have been dismissed because (1) the prosecutor misled the grand jury which indicted him by failing to reveal in response to grand jurors' questions that appellant had been coerced by threats against his life into giving the alleged perjurious testimony at the *Blasich* trial, and (2) the district court refused to order the recording of the proceedings before the grand jury, including all remarks by the Assistant U.S. Attorney. In addition appellant claims that the district court erred (1) in refusing to direct the Government to disclose the identity of an informer who had advised it of reports of threats against appellant before he testified in the *Blasich* case, (2) in its instructions to the jury regarding appellant's duty to notify law enforcement authorities regarding any such threats, and (3) in failing to state its reasons for imposing a five-year sentence. We affirm.

The present case arose out of appellant's involvement with Harry Blasich in the distribution of methamphetamines. On January 23, 1976, appellant, then on parole as the result of an earlier narcotics conviction, was arrested by agents of the Drug Enforcement Administration (DEA) and charged with conspiracy to distribute methamphetamines. Recognizing that the Government wanted to obtain evidence against someone higher up in the chain of distribution appellant agreed, after questioning by agents and by Assistant U.S. Attorney Samuel Dawson, to cooperate in making a criminal case against his supplier, Harry Blasich. Appellant's hope, of course, was that the charge against himself would be reduced and that he would receive leniency from the court. During the discussions with the DEA agents appellant was advised that if he should be successful in providing evidence leading to the indictment of Blasich he might be required to testify against Blasich and that in anticipation of such a possibility the Government was prepared to protect him by offering him the opportunity to participate in its Witness Relocation Program, under which Ciambrone and his family would be moved to another city and provided with housing, a different name and an opportunity to find a job.

At the outset, proceeding under the surveillance of DEA agents, appellant went to his home and obtained methamphetamines he kept there and turned them over to the DEA. On April 12, 1976, after being fitted out with a body tape recorder, he successfully negotiated the purchase and acquisition of two pounds of methamphetamines from Blasich, who was subsequently indicted for this transaction. The negotiation and transfer of the narcotics took place in Ciambrone's automobile after Blasich had driven it onto and off the Brooklyn Belt Parkway, engaging in several maneuvers designed to protect against detection. Immediately before Ciambrone and Blasich took off in the auto DEA agents inspected the interior of the car. Upon Ciambrone's return from his brief motor safari with

---

1. Section 1623(a) provides in pertinent part as follows:

"(a) Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Blasich the agents found a two-pound bag of methamphetamines in the trunk of his car which had not been there at the time of the earlier inspection. Ciambrone said he had agreed to buy the drug from Blasich for $11,000 and that Blasich had put the package in the trunk. This evidence was corroborated by the tape to the extent that it recorded statements by appellant and Blasich regarding the amount of the purchase price and the slam of the trunk door. However, the tape was ambiguous regarding the subject matter of the transaction because Blasich and Ciambrone used the term "turquoise" instead of amphetamines or drugs. Three days later Ciambrone paid Blasich $800 toward the $11,000 purchase price.

Thereafter appellant became disenchanted with his role. He slackened in his collaboration with the DEA agents, who were seeking to perfect the case against Blasich, and took to criticizing the agents, refusing to cooperate with them and indicating resentment at "being labelled a stool pigeon."

When the DEA learned in September 1976 that it would be required to turn over to Blasich's counsel the tapes recording appellant's April 12 purchase of the drugs from Blasich, it again sought to induce appellant to be relocated under its program but he refused. In October 1976 the DEA was told by the FBI that one of its informants had learned that appellant had been threatened by two Blasich emissaries, who told appellant that he would be "taken care of" after the trial regardless of which way he testified. Upon being confronted with this information by the DEA agents, appellant denied that any such threat had ever occurred.[2]

By November 1976 appellant ceased cooperating with the DEA. He expressed resentment at that agency's having identified

him as the informant who had helped it obtain evidence against Blasich and stated that he would "screw the agents." Thereupon he withdrew his offer to plead guilty to the January 1976 drug conspiracy charge, went to trial on that charge and was acquitted on December 3, 1976.

Upon being called by the Government to testify at the Blasich trial during the week of December 6, 1976, appellant, taking a "cocky, arrogant" attitude, advised Assistant U.S. Attorney Kramer, who was in charge of that case, that he was going to testify that his tape-recorded conversations with Blasich in April 1976 had been concerned with the purchase of turquoise stones and not with methamphetamines. He further told Kramer that he had not been threatened in any way. As a witness called by the Government at the *Blasich* trial he carried out his own threat. After being granted immunity he deliberately gave false material testimony to the effect that the two pounds of methamphetamine hydrochloride allegedly purchased by him from Blasich on April 12, 1976, had been planted upon him by DEA Agent Chellino with instructions to state, when he returned from his negotiations with Blasich, that he had "received this package from Harry Blasich." Appellant further testified falsely that he in fact had negotiated with Blasich for the purchase of turquoise stones. Judge Weinstein, before whom the Blasich case was being tried, concluded, "Either there has been a crime committed by the members of the DEA or this witness has perjured himself." He directed that the matter be investigated and that Ciambrone be held in custody overnight.

On December 7, 1976, before the completion of the Blasich trial, the Government filed a complaint with a U.S. Magistrate charging Ciambrone with violating Title 18

---

**2.** Appellant told the DEA agents that "the whole thing was—just plain bull, it wasn't true. . . ." and that this was "just a scam to get [appellant] to continue to cooperate." Later in October the same FBI source advised the DEA agent in charge of appellant's case (Vigna) that "there was a contract out on [appellant's] life." Upon being confronted with this information

by his Probation Officer appellant expressed the view that this was "a ploy, a trap on the part of DEA Agent Vigna, to get [appellant] to go back with them" and that "he [appellant] didn't believe that, . . . he didn't believe it was genuine." Again appellant refused to accept the DEA's offer of its relocation services.

U.S.C. § 1623 by giving false testimony at that trial. Ciambrone was released on bail fixed by Judge Mishler as $500 in cash, with a personal recognizance bond of $5,000. Notwithstanding appellant's false testimony the jury found Blasich guilty of possession of methamphetamines with intent to distribute. Shortly thereafter the Government indicated that it would seek a perjury indictment against appellant. On December 27, 1976, Ciambrone was again arrested, this time for failure to appear before the Magistrate for a preliminary hearing and for violation of parole. On January 7, 1977, he submitted his affidavit in support of an application for bail, reciting in detail the story of his cooperation with the DEA and his participation as a witness in the *Blasich* trial. At no point did this affidavit state that he gave any testimony at the Blasich trial under duress or as the result of any threats to his life.[3]

On January 18, 1977, appellant's counsel, upon being informed by Assistant U.S. Attorney Lee A. Alderstein that the Government would be presenting evidence shortly to a grand jury with respect to the perjury charge, sought an order from the court directing the U.S. Attorney (1) to record all testimony and remarks of Government representatives, including the prosecutor, in the presentation of the case to the grand jury, (2) to refrain from characterizing evidence to the grand jury, and (3) to advise the grand jurors of all elements of the offense for which an indictment was to be sought, including various defenses. Appellant's attorney acknowledged that he had discussed with the Government the possibility of affording Ciambrone the opportunity to testify before the grand jury and that the order was relevant to the defenses that Ciambrone, when he made allegedly false statements under oath at the *Blasich* trial, (1) "believed them to be true" and (2) "was

acting under duress." In response, Assistant U.S. Attorney Bernard J. Fried wrote a letter to Judge Bramwell, a copy of which was sent to appellant's counsel, taking the position that while it was the practice of his office to record all testimony of grand jury witnesses, the Government was not obligated, in view of this Court's decision in *United States v. Peden*, 472 F.2d 583 (2d Cir. 1973), to record the remarks of a prosecutor. He further stated that, although a defendant had no right to appear before a grand jury or to present evidence favorable to the defense, the Government would,

> "in accordance with our usual practice when a defendant requests to appear before the Grand Jury, . . . invite defendant Ciambrone to do so. Furthermore, we will, of course, advise the Grand Jury of all the elements of the offense or offenses for which an indictment is sought, and we will invite counsel for defendant Ciambrone to submit such written instructions as he may deem appropriate. If upon review, we concur with the appropriateness of this submission, it will be presented to the Grand Jury."

Finally, the letter opposed any order directing the Assistant U.S. Attorney to refrain from characterizing evidence put before the grand jury.

On January 27, 1977, Judge Bramwell denied the defendant's motion. An attempted interlocutory appeal by Ciambrone to this court was denied on February 2, 1977. On February 3, 1977, evidence was presented by Assistant U.S. Attorney Adlerstein to a grand jury which returned the indictment against Ciambrone. Appellant did not appear and his counsel did not present to the Assistant U.S. Attorney any written instructions for submission to the grand jury.

---

**3.** The affidavit was devoted for the most part to a history of appellant's earlier arrest, arrangements with the DEA agents to cooperate in obtaining evidence against Blasich, and the agents' later alleged violation of promises not to call Ciambrone as a witness or reveal his identity to third persons. The affidavit appears to represent a conscious effort to portray Ciam-

brone as the victim of mistreatment by the Government. Although mention is made of danger that Ciambrone might face if his cooperation became known, the affidavit does not refer to any actual threats, efforts by the agents to induce him to participate in the Witness Relocation Program (other than in a "special jail,") or his refusal to participate.

Prior to the trial of the present case appellant, upon being furnished with a transcript of the relevant portions of the grand jury proceedings leading to his indictment, moved to dismiss the indictment on the ground that the Government had withheld evidence of threats to appellant despite inquiries by grand jurors as to why appellant would have lied under oath "if he knew he was going to get taped," to which the Assistant U.S. Attorney responded that appellant and Blasich were "friends" without advising the grand jury of reports from an informant that appellant's life had been threatened. Judge Bramwell denied the motion, stating that the Government was not required either to speculate regarding what was going on in appellant's mind or to present possible defenses. The court further observed that no formal defense had been interposed and that there was no reason for the Government to indicate any credence in possible threats to appellant's life.

The present case was tried before Judge Platt in March 1978. In support of the perjury charges the Government relied principally on the testimony of the DEA agents regarding appellant's initial cooperation, his brief automobile trip with Blasich on April 12, 1976, from which he returned with two pounds of methamphetamines, which he said he had bought from Blasich for $11,000, the tape recordings of that trip and of the down payment on April 15, 1976, Ciambrone's disaffection, his refusal to be relocated, his repeated denials that he had been threatened, and his false testimony at the Blasich trial to the effect that he had not purchased the two pounds of methamphetamines from Blasich but had merely bought and taken delivery of turquoise stones from Blasich after the DEA agents had induced him to frame Blasich.

In an effort to establish duress as a defense, appellant requested the Government to produce the informant who had advised it of the threats to appellant's life. The request was refused on the ground that since the informant's life would be jeopardized if his identity were revealed, the Government was entitled to invoke the informant's privilege, see *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). After holding several *in camera* hearings Judge Platt denied the request.[4]

Appellant did not testify in his own defense. He introduced testimony by his aunt that during the period between Thanksgiving and Christmas 1976 she received a telephone call from an unidentified male who stated that appellant had "ratted out three people," which she relayed to appellant.

Judge Platt instructed the jury that coercion or compulsion may constitute a legal excuse to a defendant for crimes charged against him, provided (1) it is immediate and likely to induce a well rounded fear of impending death or serious bodily injury, (2) there is not reasonable opportunity to escape the compulsion without committing the crime, and (3) the defendant has taken reasonable steps to extricate himself from the apparent danger. After deliberating the jury twice attempted to render a qualified verdict of guilty, concluding in substance that, even assuming the defendant had committed perjury because of fear for his life, he had failed to make use of avenues for avoiding the crime. The jury criticized the failure of the law to excuse perjury where the defendant believes that available avenues would not remove the threat to his life.

The court refused to accept a "qualified" verdict of guilty, reinstructing the jury that

---

4. Judge Platt sought to resolve the issue by suggesting as a compromise that the parties might agree that the informant would testify that there had been a bona fide threat on appellant's life, made two months before the *Blasich* trial, which had come from a source capable of carrying it out. The Assistant U.S. Attorney in charge of the case offered to agree that the threat was genuine but took the position that the validity of duress as a defense depended

upon appellant's reactions and state of mind when he testified at the *Blasich* trial rather than on whether he had been threatened. Appellant's counsel countered the court's suggestion by seeking to have appellant testify *in camera* in the prosecutor's absence regarding appellant's need for identification of the informer. Understandably, this was denied by Judge Platt.

if the defendant had not taken reasonable steps to use means available for protecting himself and his family it might find that the Government had proved its case beyond a reasonable doubt and find him guilty but that if no such reasonable opportunity existed or he took all reasonable steps to extricate himself, then it must acquit him. The jury finally rendered an unqualified verdict of guilty.

Immediately prior to being sentenced by the court in May, 1978, appellant volunteered for the first time in an affidavit that he had been threatened by two men in July, 1976, that if he testified he and his son would die, that he did not advise the DEA agents of this threat because he did not trust them, that he had perjured himself at the *Blasich* trial, and that he had not testified at his own trial for fear of his own safety.

### DISCUSSION

Appellant first contends that his conviction should be reversed and the indictment dismissed because the Assistant U.S. Attorney presenting evidence to the grand jury misled it when, in response to grand jurors' inquiries, he failed to advise it that appellant had been threatened but suggested instead that appellant was motivated to testify falsely at the *Blasich* trial because of his friendship with Blasich. To dispose of this contention, review of a few controlling legal principles is helpful.

▮ The main function of a grand jury is to determine whether or not probable cause exists to believe that a crime has been committed, and, if so, to file charges against such persons as are reasonably believed to have committed it. *Branzburg v. Hayes*, 408 U.S. 665, 686–87, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). An indictment, of course, is merely a charge and does not constitute any evidence of guilt. The grand jury has the equally important duty of protecting persons against unfounded or unsupported charges and, absent a finding of probable cause, it may not file an indictment. *Id.*

▮ The grand jury possesses broad investigative power to enable it to carry out this function. It may compel production of such evidence and testimony as it considers appropriate, "unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials," *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956). As a practical matter, however, it must lean heavily upon the United States Attorney as its investigator and legal advisor to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles. Despite recent movements for revision of grand jury procedure,[5] a prosecutor is not presently obligated to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury. See *United States v. Y. Hata & Co., Ltd.*, 535 F.2d 508, 512 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976); *United States v. Ruyle*, 524 F.2d 1133, 1135–36 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated," *United States v. Calandra, supra*, 414 U.S. at 343, 94 S.Ct. at 618. To convert a grand jury proceeding from an investigative one into a mini-trial of the merits would be unnecessarily burdensome and wasteful, since, even if an indictment should be filed, the defendant could be found guilty only after a guilty plea or criminal jury trial in which guilt was established beyond a reasonable doubt. For this reason we have held that a defendant does not have a constitutional right to appear personally before the grand jury,

---

**5.** See Frankel and Naftalis, The Grand Jury (Hill & Wang 1975); H.R. 94, introduced on January 4, 1977, into the 95th Cong., 1st Sess., and referred to by the Committee on the Judiciary; Resolution on Grand Jury Reform adopted by American Bar Association House of Delegates, August 9, 1977.

*United States ex rel. McCann v. Thompson,* 144 F.2d 604 (2d Cir.), *cert. denied,* 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944); *United States v. Rosen,* 259 F.Supp. 942 (S.D.N.Y.1968). Nor does a prospective defendant presently have the right to cross-examine witnesses before the grand jury. In general, an indictment is not defective because the defendant did not have an opportunity to present his version of the facts before the grand jury. As Justice Black stated in *Costello v. United States, supra,* 350 U.S. at 363, 76 S.Ct. at 408:

> "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." [Footnote omitted] 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397.

 On the other hand, the prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it. The prosecutor, for instance, may not obtain an indictment on the basis of evidence known to him to be perjurious, *United States v. Basurto,* 497 F.2d 781, 785–86 (9th Cir. 1974), or by leading it to believe that it has received eyewitness rather than hearsay testimony, *United States v. Estepa,* 471 F.2d 1132, 1136–37 (2d Cir. 1972). We would add that where a prosecutor is aware of any substantial evidence negating guilt he should, in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the jury not to indict. See ABA Project on Standards for Criminal Justice—The Prosecution Function, § 3.6, pp. 90–91.

Examining the record before us in the light of these principles we find that Assistant U.S. Attorney Adierstein's responses to grand jurors' inquiries regarding appellant's motive for testifying falsely at the *Blasich* trial fall far short of misleading conduct or deception that would call for dismissal of the indictment in the present case. In the first place it must be noted that the statements of the Assistant U.S. Attorney to which appellant now objects were made in the course of attempting to answer a confusing flurry of other questions simultaneously being asked (apparently by different grand jurors) during Agent Vigna's testimony, much of which did not relate to Ciambrone's motives for testifying falsely at the *Blasich* trial. Some of the jurors' questions, for instance, dealt with the nature of the information revealed by the taped record of the April 12, 1976, Ciambrone-Blasich negotiations, what mention was made on that taped record of narcotics, drugs or methamphetamines, how one could determine whether turquoise stones or drugs were in the package placed by Blasich in the trunk of Ciambrone's car, what charges were pending against Ciambrone at the time of the taped negotiations, and the like.

Two questions pertained to Ciambrone's motives. One juror asked "May we know what was on the tape? If Ciambrone was taped—did he obtain any information? Why would he lie if he knew he was going to get taped?" This juror's questions suggest that if the taped record clearly revealed a narcotics transaction, Ciambrone would have been stupid to testify otherwise. Of course, as the prosecutor and witness made clear, the taped record did not refer specifically to drugs or make out an open-and-shut case against Ciambrone.

The other question sought the prosecutor's views as to Ciambrone's motive for committing perjury. A grand juror asked "What could he [Ciambrone] gain by lying?". Adlerstein replied, with the aid of

Agent Vigna's testimony, that "Mr. Ciambrone and Mr. Blasich were friends," who had been "doing dealings with each other," and that Ciambrone probably did not want to see his drug connection, Mr. Blasich, convicted.

Nothing in the record before us indicates that Assistant U.S. Attorney Adlerstein was not giving his own honest view of Ciambrone's motive. The record of the *Blasich* trial, which had been examined by Adlerstein and presented in part to the grand jury, contains testimony by Ciambrone that he had known Blasich for 8 years "on a friendship basis," that they lived in the same neighborhood, rode motorcycles and dated together, and that Ciambrone would "characterize [his] relationship with Mr. Blasich on April 12, 1976 . . . [as] . . . friends—business associates in a way, as far as him bringing me stones from Arizona, turquoise and also silver." (Tr. 52–53). The *Blasich* record (at p. 121) also contains a statement by Judge Weinstein, who presided at the *Blasich* trial, that he "did notice the defendant [Blasich] talking to the witness [Ciambrone] as the witness left earlier today. I may have to, therefore, be a witness in any prosecution. . . ."

There is no evidence that Adlerstein had ever been apprised of the information relayed some months earlier (October 1976) from an unidentified FBI informant via the FBI to the DEA agents and to Assistant U.S. Attorney Kramer regarding threats to Ciambrone. The prospect that Ciambrone would claim that he had testified falsely because of threats from Blasich did not definitely materialize until after the grand jury in February, 1977, filed the indictment against Ciambrone and his attorney was furnished as § 3500 material with the transcript of grand jury testimony of witnesses, including DEA Agent Vigna. Then Ciambrone's counsel, seizing upon Assistant U.S. Attorney Adlerstein's answers to the grand jurors in response to their inquiry, apparently decided to defend on the theory that Ciambrone had testified falsely because he had been threatened by Blasich representatives and feared for his life. Prior to that, although his attorney had mentioned "coer-

cion" as a possible defense among others he had also adhered to the position taken earlier that Blasich had testified truthfully and also suggested as a defense that Blasich might have lacked the mental capacity to commit the crime. In this context mention of "coercion" as one of several alternative defenses could hardly have alerted Adlerstein to earlier third-hand rumors of threats, especially if Adlerstein had no knowledge of the reports. Indeed, Ciambrone had steadfastly denied having been threatened, even when asked by Assistant U.S. Attorney Kramer just before he testified falsely at the *Blasich* trial.

True it is that Vigna had been advised some months earlier of the information relayed from an informer via the FBI to the DEA to the effect that Ciambrone had been threatened, and Assistant U.S. Attorney Kramer had referred to the threat in early December when bail was set by Judge Mishler. However, in view of Ciambrone's repeated and vehement denials that any such threats had occurred, his countercharge that the rumor of threats was a DEA "scam" or falsity designed to induce him to cooperate in the case against Blasich, and his refusal of the DEA offer to be relocated, Vigna would have been justified in believing that Ciambrone had not perjured himself because of any coercion or fear.

Aided by hindsight we can say that on the record as it existed on February 3, 1977, the date of the grand jury's investigation, it would have been wiser for Adlerstein (if he actually knew of the rumored threat) or Vigna to advise the grand jury of the information as a possible motive. But if, as appears to have been the case, Adlerstein and Vigna actually believed that Ciambrone had lied to save his longtime friend and narcotics connection from conviction, there was nothing improper in so stating in response to a grand juror's question seeking their view as to Ciambrone's motive, without volunteering other possibilities, including coercion. Indeed, if, as Ciambrone and his counsel had both indicated, they should defend on the ground that he had testified

truthfully, and Vigna had mentioned the rumor of threats to the grand jury as a possible motivation, Ciambrone might now be claiming that the mention of threats was misleading unless Vigna had told the entire history, including Ciambrone's denial that any such threats had ever occurred, and unless Adlerstein had fully explained to the grand jury the law regarding duress and coercion as defenses.

■ In appraising Ciambrone's present claim that the prosecutor misled the grand jury as to his possible motivation, the fact that Ciambrone had been invited to testify before the grand jury and his lawyer had been accorded the opportunity to submit his views or contentions to that body strongly tends to negate any deliberate omission by the prosecutor or Vigna of the rumor of threats, since it was always possible that Ciambrone, whose attorney had been advised of the time and place of the grand jury sitting, would appear with his attorney and assert the coercion defense they later chose to adopt. *United States v. Mandel,* 415 F.Supp. 1033, 1040 (D.Md.1976), *conviction reversed on other grounds, United States v. Mandel,* 591 F.2d 1347 (4th Cir. 1979). ("The fact that the government gave the defendant that opportunity [to present the government with a list of exculpatory witnesses to be called before the grand jury, which the defendant chose not

to do] is an important factor in determining whether the government failed to present exculpatory information before the grand jury.") Lastly, even if the earlier-rumored threats had been presented to the grand jury it appears extremely unlikely, in light of the later verdict finding Ciambrone guilty after full airing and jury consideration of his belated duress defense, that the grand jury would have failed to indict. We may reasonably conclude that, since the later petit jury before which the charges were tried rejected the duress and coercion defenses on the ground that Ciambrone had failed to take reasonable steps to extricate himself from danger and found Ciambrone guilty of perjury beyond a reasonable doubt, the grand jury would surely have found probable cause to charge him with perjury. Any error would not therefore warrant dismissal of the indictment.[6] Compare *United States v. Philips Petroleum Co.,* 435 F.Supp. 610 (N.D.Okl.1977) (indictment dismissed where testimony clearly tended to negate guilt).

■ Appellant's next contention—that the conviction must be reversed because of the Government's failure to record the entire grand jury proceedings—must be rejected because of its erroneous assumption that some testimony or remarks of the prosecutor were not recorded. The grand jury transcript, which appears to be a full rec-

---

**6.** In his dissent our esteemed colleague, Judge Friendly, proceeds on the assumption that when Assistant U.S. Attorney Adlerstein, on February 3, 1977, answered grand jurors' queries regarding Ciambrone's motivation for giving false testimony, he (Adlerstein) knew that the FBI had been advised by an informant in October 1976 that Ciambrone had been threatened by two Blasich representatives or that such knowledge could be imputed to Adlerstein under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The record contains no evidence that Adlerstein knew of the reported threats, much less that he credited the report notwithstanding Ciambrone's vehement denials that the threats occurred. Absent evidence of knowledge or deliberate misconduct, dismissal is not warranted.

This case is unlike *Giglio.* It involved the fairness of a trial which, as we have noted, is governed by standards far more exacting than those applicable to a grand jury proceeding.

Moreover, decisions such as *Estepa, supra,* represent exercise of the court's supervisory powers over federal judicial processes rather than direct application of the Fifth Amendment's right to indictment by a grand jury in felony cases. Even if information known to another Assistant U.S. Attorney in the office of the U.S. Attorney for the Eastern District were imputed to Adlerstein, we do not think dismissal of the indictment would be warranted under the circumstances of this case. Lacking actual knowledge of the situation, Adlerstein cannot be charged with prevarication or deceit. Moreover, the blameworthiness of the Government's conduct is further reduced by the fact that appellant was invited to testify before the grand jury or to submit instructions for it and that at the time of the proceeding he was denying the truth of the information he now claims should have been made known to the grand jury.

ord, includes remarks made by the prosecutor, in particular those made with respect to Ciambrone's motive, now claimed to be misleading.

 Although the Government vigorously argues that it is not required to record remarks or even testimony, citing our decisions in *United States v. Peden,* 472 F.2d 583, 584 (2d Cir. 1973); *United States v. Cramer,* 447 F.2d 210, 214 (2d Cir. 1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 680, 30 L.Ed.2d 674 (1972), and *United States v. Ayers,* 426 F.2d 524, 529 (2d Cir.), *cert. denied,* 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970), we did point out in each of these cases that "recordation as a matter of course certainly is the better procedure." Since a grand jury's proceeding is usually ex parte and secret, there appears to be no reason why the entire proceeding, including any remarks of the prosecutor, should not usually be recorded. See American Bar Assn., Standards Relating to the Administration of Criminal Justice, The Prosecution Function § 3.5, pp. 90–91 (1974).

 We likewise find no merit in appellant's argument that Judge Platt abused his discretion in refusing to order disclosure to Ciambrone of the name of the informer who had advised the DEA of the threats on Ciambrone's life prior to the trial of Blasich. The basis for the informer privilege is too well-recognized to require explication. See *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1953); *McCray v. Illinois,* 386 U.S. 300, 308–11, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Tucker,* 380 F.2d 206, 213 (2d Cir. 1967); 8 Wigmore, Evidence § 2374 at 761–62 (McNaughton rev. ed. 1961); 2 Weinstein & Berger on Evidence § 510(02) (1977). After holding an *in camera* hearing and weighing all relevant factors, including the nature of the crime charged and the possible significance of the informer's testimony, Judge Platt properly concluded that non-disclosure of the informer's identity here would not

deny Ciambrone a fair trial. Since the threats were made by two friends of Blasich who sat down with Ciambrone, the latter was in a position to furnish all details to his counsel. Moreover, the Government offered to concede the genuineness of the threat, and the jury's later statements to the district court upon rendering its verdict, established that the jury, as it stated in a note to Judge Platt, was "not convinced that the defendant was not acting out of fear." Under these circumstances disclosure of the informer's identity was unnecessary to resolve the issues on trial.[7] As the trial jury later found, Ciambrone's duress defense failed because of inability to show that he availed himself of reasonable means of extricating himself and not because of failure to show threats and fear.

 Appellant next argues that after the jury had twice attempted to render a qualified verdict of guilty the trial judge erred in instructing the jury, in reliance upon *United States v. Patrick,* 542 F.2d 381, 388 (7th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), that Ciambrone "had an affirmative duty to inform the government authorities and the Court of the threats and of his reluctance to testify correctly unless adequate safeguards were taken to protect himself and his family . . . ." The contention is that this instruction shifted the burden of proof to appellant. We disagree. Judge Platt repeatedly instructed the jury that the Government had the burden of establishing each and every element of the crime of perjury beyond a reasonable doubt. He further charged properly that coercion or duress would excuse the defendant only if it was present, immediate and of such a nature as to induce a well-founded fear of impending death or serious bodily injury from which there was no reasonable opportunity to escape without committing perjury, see *United States v. Housand,* 550 F.2d 818, 825 (2d Cir.), *cert. denied,* 431 U.S. 970,

---

7.. The Government joined the court in affording Ciambrone a full opportunity to introduce evidence that he had testified falsely out of fear by suggesting that if he should take the witness stand to testify regarding threats to himself, it could be persuaded not to interrogate him about his prior drug conviction or a damaging psychiatrist's report. (Tr. 10–14, 441).

97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). Even accepting as true the rumors that Ciambrone had been threatened by two of Blasich's henchmen some months before the trial of *Blasich,* the proof was undisputed that Ciambrone had failed to take advantage of reasonable opportunities offered by the DEA agents to escape compulsion. Under these circumstances, Judge Platt would have been justified in refusing to submit the defense of coercion or duress to the jury. See *Patrick, supra,* 542 F.2d at 388; *United States v. McClain,* 531 F.2d 431, 438 (9th Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Shannon v. U. S.,* 76 F.2d 490, 493 (10th Cir. 1935). Once he decided in his discretion to do so, however, it was his duty to point out that the defense is qualified by the witness' obligation to take advantage of any reasonable opportunity to extricate himself by informing the Government of the threats so that he could be protected. His obligation to take such steps is not to be confused—nor was it in this case—with the Government's burden of proving the perjury, which Judge Platt made clear. The notes from the jury here did not indicate any doubt about its understanding of the applicable law or the result that must be reached when that law was properly applied. What the jury questioned was the wisdom of the law itself which, of course, was not its province.

 Appellant's last contention—that Judge Platt erred in failing to state his reasons for imposing the maximum five-year sentence—need not detain us long. We have repeatedly held that, while such a statement of reasons is preferred, it is not mandatory, see, e.g., *United States v. Seijo,* 537 F.2d 694, 699 (2d Cir. 1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). The trial judge did not act on the basis of erroneous factual assumptions or constitutionally impermissible considerations. Ciambrone's conduct, including false testimony that DEA agents had induced him to "frame" a supposedly innocent victim, was particularly heinous and committed by a person with a criminal record who appears to have had a disregard and disrespect for the law.

The judgment of conviction is affirmed.

FRIENDLY, Circuit Judge, dissenting:

I regret that my respected brothers should work so hard at the impossible job of finding a basis for extenuating the prosecutor's failure to give the grand juror's questions the candid answers they deserved.

It is not disputed that in October 1976 the FBI informed the DEA that Blasich's friends had told Ciambrone that they "would take care of" him after the Blasich trial—information which the Government took so seriously as to offer relocation. It is likewise not disputed that on December 7, 1976, Assistant United States Attorney Kramer, who had represented the Government in the Blasich trial, unequivocally stated to Chief Judge Mishler, in opposing Ciambrone's application for bail on the false declaration charge, that Blasich had "put a contract" on Ciambrone's life. In the face of Kramer's positive statement the Government cannot now be heard to say that its belief in the threats was dispelled by Ciambrone's previous denials of them, denials which no experienced prosecutor would take at face value in any event, or by his refusal to accept the relocation offer.

The very first question asked by a grand juror after Assistant United States Attorney Adlerstein invited questions at the end of Agent Vigna's testimony went directly to the point "Why would he [Ciambrone] lie if he knew he was going to get taped?" While this may have been inartistically worded, the Assistant must have known what was bothering the juror—why would Ciambrone give false testimony at the Blasich trial if he knew the Government had sure means of proving he was a liar. After the failure of an initial endeavor to discourage the jurors by saying "That is something that we cannot speculate on why he would", the Assistant, in response to questions about the contents of the tape, had Agent Vigna testify that "No mention was made whether it was a package of drugs or a package of stones". A juror then asked whether Ciambrone had been "brought up on any charges". The Assistant first re-

sponded "that there may have been charges against him at the time", presumably of the taping, but that also was not for the jury to consider. The grand jury was not so easily put off. A juror said:

On the contrary. I feel that if there were no charges brought against him or he was not brought up on trial or anything himself, why would he lie in a situation when he is being taped and he knows his conversation is being taped? This is the point.

The Assistant made the unresponsive answer that Ciambrone had been charged with an earlier offense but had been acquitted immediately prior to the Blasich trial. Whether so intended or not, this answer gave the jurors a basis for thinking that Ciambrone's change of story was due to the fact that he no longer needed the benefits of cooperation. However, the jurors were not fobbed off; one of them asked "What could he gain by lying?"

Forced to do something that would still the grand jurors' concerns, the Assistant then brought out from Agent Vigna that Ciambrone and Blasich were friends and that Blasich was Ciambrone's drug connection. The Assistant volunteered that this may have been the motive for which the jurors were searching. A juror then said that "what might be confusing some of the folks here was that why would this man who obviously has a past in crime suddenly become an agent?" Grasping this false lead, the Assistant and the Agent brought out that there had been an arrangement whereby in return for his cooperation the Government would help if Ciambrone "were convicted of any criminal charges" but that when it "came time to be asked to testify as to Mr. Blasich", he testified the way the grand jury had heard—inferably solely because he had already been acquitted and was a friend of Blasich.

Not once during this colloquy, recorded in four pages of transcript, did the Assistant give the grand jurors the slightest inkling that the Government had every reason to think Ciambrone had a motive for giving false testimony at Blasich's trial much more powerful than friendship with Blasich or the effect of his own acquittal—a motive which Assistant United States Attorney Kramer had fully and properly exploited when that served the Government's purpose. Mr. Kramer testified before the grand jury immediately prior to the episode just described; the transcript does not show whether he was in the grand jury room when it occurred. The Government does not argue, as do the majority, fn. 6, that AUSA Adlerstein did not know what Agent Vigna and AUSA Kramer surely did. Any such assertion would strain credulity beyond the breaking point. As Mr. Justice Frankfurter observed in *Watts v. Indiana*, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949), there comes a time when we "should not be ignorant as judges of what we know as men." In any event, for our purposes, it does not matter. Adlerstein cannot be insulated from the rest of the prosecution team, *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Neither does it matter whether or not Adlerstein "credited" the report on which the Government had relied in resisting bail; he was still bound to tell the grand jurors what the prosecution knew.

As the Supreme Court has noted, "the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury'". *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). Before the grand jury the prosecutor has the dual role of pressing for an indictment and of being the grand jury's adviser. In case of conflict, the latter duty must take precedence. *United States v. Remington*, 208 F.2d 567, 573–74 (2 Cir. 1953) (L. Hand, J., dissenting), *cert. denied*, 347 U.S. 913, 74 S.Ct. 476, 98 L.Ed. 1069 (1954).

The *ex parte* character of grand jury proceedings makes it peculiarly important for a federal prosecutor to remember that, in the familiar phrase, the interest of the United States "in a criminal prosecution is not that it shall win a case, but that justice

shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). While, as the majority says, "a prosecutor is not presently obligated to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury," the corollary is that when a grand juror requests advice, the prosecutor may not fence with him but must respond fully and fairly.[1] No amount of parsing can show that this was done here. Also it is of no moment that, after considerable prodding by the trial judge, the petit juror rejected Ciambrone's duress and coercion defenses on the ground that he had failed to take reasonable steps to protect himself.

The grand jury is not bound to indict in every case where a conviction can be obtained. As Judge Wisdom has written:

> By refusing to indict, the grand jury has the unchallengeable power to defend the innocent from government oppression by unjust prosecution. And it has the equally unchallengeable power to shield the guilty, should the whims of the jurors or their conscious or subconscious response to community pressures induce twelve or more jurors to give sanctuary to the guilty. *United States v. Cox,* 342 F.2d 167, 189–90 (5 Cir.) (Wisdom, J., concurring specially), *cert. denied sub nom. Cox v. Hauberg,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965).[2]

The jurors' persistent questioning shows there was at least a strong prospect that disclosure of the threats to Ciambrone, even with all the qualifications which the Government was entitled to put forward, might well have resulted in no true bill being returned. A substantial possibility of this is all that is needed to warrant our quashing the indictment. *United States v. Remington, supra,* 208 F.2d at 574 (L. Hand,

J., dissenting); *United States v. Fields,* 592 F.2d 638, 647–48 (2 Cir. 1978); *United States v. Broward,* 1625–26, 594 F.2d 345, 350–51 (2 Cir. 1979). Mere rebuke, which the majority does not even see fit to administer, is insufficient to maintain the complete prosecutorial candor necessary to permit the grand jury to perform its historic role.

---

1. Such fencing is not excused by the facts that counsel for Ciambrone suggested prior to the grand jury proceedings that Ciambrone might raise defenses other than duress, or that Ciambrone declined to appear before the grand jury or to submit instructions for its consideration.

2. That a grand jury may legitimately perform a quasi-equitable function is implicit in its role as "an irresponsible utterance of the community at large, answerable only to the general body of citizens, from whom they come at random, and with whom they are again at once merged." *In re Kittle,* 180 F. 946, 947 (S.D.N.Y.1910) (L. Hand, J.). See also *Charge of John Raymond Fletcher, Associate Judge, to a Grand Jury,* 18 F.R.D. 211, 214 (Cir.Ct.Md.1955); *United States v. Asdrubal-Herrera,* 470 F.Supp. 939 (N.D.Ill.1979).