UNITED STATES of America

v.

Mutulu SHAKUR, a/k/a "Doc," a/k/a "Jeral Wayne Williams," Sekou Odinga, a/k/a "Nathaniel Burns," a/k/a "Mgabasi," a/k/a "Mugubasi," a/k/a "Eddie Holmes," a/k/a "Lou," Cecil Ferguson, a/k/a "Mo," a/k/a "Chui," Edward Lawrence Joseph, a/k/a "Edward Lawrence," a/k/a "Jamal," a/k/a "Tony," a/k/a "J.R.," William Johnson, a/k/a "Bilal Sunni-Ali," a/k/a "Spirit," Silvia Baraldini, a/k/a "Louise," Susan Rosenberg, a/k/a "Elizabeth," Cheri Dalton, a/k/a "Nahanda," Iliana Robinson, a/k/a "Naomi," Nilse Cobeo, a/k/a "Nilse Lawrence," a/k/a "Ginger," a/k/a "Gigi," a/k/a "Giovanni Correa," and Alan Berkman, Defendants.

No. SSS 82 Cr. 0312 (KTD).

United States District Court,
S.D. New York.

March 28, 1983.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for the Government; Robert S. Litt, Stacey J. Moritz, Asst. U.S. Attys., New York City, of counsel.

Sekou Odinga. pro se.

Jesse Berman, New York City, for defendant Cecil Ferguson.

William Mogulescu, New York City, for defendant Edward Joseph.

Chokwe Lumumba, Detroit, Mich., Lynn Stewart, New York City, for defendant William Johnson.

Susan Tipograph, New York City, for defendant Silvia Baraldini.

Lawrence Stern, New York City, for defendant Iliana Robinson.

Robert Bloom, New York City, for defendant Alan Berkman.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendants Ferguson and Joseph move to dismiss the indictment for prosecutorial abuse of the grand jury. This motion is

based on four allegations of misconduct by the United States Attorney's Office: (1) withholding from the grand jury the mental and physical status of government informants Yvonne Thomas and Samuel Brown; (2) offering hearsay testimony of Brown and Thomas to the grand jury when they were cognizant that neither would testify before the grand jury; (3) using grand jury subpoenas to freeze witnesses' testimony for trial; and (4) allowing United States Attorney John Martin and Assistant United States Attorney ("AUSA") Pomerantz to bolster the prosecution's own credibility and that of the Federal Bureau of Investigation ("FBI") agents while at the same time degrading Brown's lawyers. This motion is joined in by all the defendants.

The main purpose of a grand jury investigation is to uncover probable cause that a crime has been committed and probable cause that certain defendants committed the crime. It is the duty of the prosecution to present information as to these inquiries to the grand jury. It is the extraordinary situation where much more will be required of either the prosecutor or the grand jury before an indictment can be returned.

The defendants here claim that this case presents that extraordinary situation and that the grand jury has failed in its duty to protect the innocent public from the overzealous prosecutor. *United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir.1979). This claim is totally without merit.

■ It must be noted first, that in the performance of their duties, neither the grand jury nor the prosecutor presenting the case is bound strictly by the formal rules of evidence. *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). This flexibility is not possible when a jury is sitting in a criminal trial determining whether guilt has been proven beyond a reasonable doubt. The grand jury, on the other hand, has the limited function of determining if probable cause exists to support an indictment. A grand jury is not a forum for a mini-trial of the issues. Courts have repeatedly rejected

defense counsels' attempts to convert the grand jury proceedings into a "preliminary trial" and to bind the prosecutor by the rules of evidence. *Id.; United States v. Ciambrone,* 601 F.2d at 622.

■ Concededly, the informality of the grand jury proceedings does not erode all government obligations. · It must still present its case fairly with appropriate concern for the interests of justice. The government, although not obligated to divulge exculpatory evidence pursuant to *Brady v. Maryland* and the Jencks Act, must still present to the grand jury known "substantial evidence negating guilt ... where it might reasonably be expected to lead the jury not to indict." *United States v. Ciambrone,* 601 F.2d at 623. This does not, however, require the prosecutor to outline all available defenses or to delve into all evidence to uncover potentially exculpatory information. *Id.; United States v. Sun Myung Moon,* 532 F.Supp. 1360, 1368 (S.D.N.Y.1982).

■ Failure of the government to comply with its grand jury obligations may present the extraordinary circumstance that triggers exercise of the court's supervisory powers to dismiss the indictment. *United States v. Sun Myung Moon,* 532 F.Supp. 1360, 1369–70 (S.D.N.Y.1982). *See generally United States v. Artuso,* 618 F.2d 192, 196–97 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980).

The defendants' allegations must be evaluated against this legal backdrop.

### 1. *Samuel Brown*

#### a. Pomerantz testimony

Samuel Brown, a defendant in the collateral Rockland County indictment, first contacted the federal government with his desire to cooperate in November 1981, shortly after the October 20, 1981 incident. Mr. Brown subsequently met with FBI Agents Robert Cordier and Kenneth Maxwell ten times over a four month period.[1]

1. Visits between Brown and these FBI agents     took place on November 21, 1981, November

On the morning of March 31, 1982, less than twenty-four hours after Brown's cordial meeting with Agent Maxwell, Agent Cordier, AUSA's Parver and Pomerantz, Brown refused to speak with these government officials or to cooperate further. Brown sent letters to AUSA Parver through the Marshals to this effect. AUSA Pomerantz went before the grand jury on this date and related Brown's apparent change of heart. During his introduction of Pomerantz to the grand jury, the United States Attorney, John Martin, elicited Pomerantz's past employment as law clerk to District Court Judge Edward Weinfeld and Associate Justice Potter Stewart. March 31, 1982 Grand Jury Testimony of Mark Pomerantz at 2. Pomerantz also told the grand jury of his present position as Chief Appellate Attorney in the United States Attorney's Office, a job that entails staying abreast with the changing state of the law. *Id.* at 3. Pomerantz then read to the grand jury the letters sent by Brown to AUSA Parver stating that Maxwell and Cordier extracted information from him under "fear of further beatings and perhaps death." *Id.* at 29. Brown's letters further stated that he refused to continue to cooperate and remain subject to this "method of cruel and unusual punishment." *Id.*

Pomerantz found these letters inconsistent with Brown's stance the previous evening:

> As of the night before Mr. Brown had indicated that he considered the agents his friends, that he did not trust some of the attorneys with whom he had previously spoken; and he made specific reference to Miss Tipograph; and he indicated on the night before that he saw it as one of his functions to provide an example for people who had gotten caught up in this episode without really knowing what they had done and that he hoped by cooperating to serve as an example to others.

*Id.* at 8. Pomerantz's testimony continued to tell of Brown's surprise that defense lawyers had filed a lawsuit in his behalf alleging physical torture. *Id.* at 31.

In connection with the Pomerantz testimony, the defendants allege that the bolstering of both the FBI agents and Pomerantz's credibility at the same time the grand jury was presented with Brown's refusal to continue his cooperation constituted abuse.

■ Perhaps it was unnecessary for Martin to present Pomerantz's credentials to the grand jury, but his decision to do so does not amount to grand jury abuse. The prosecutor controls the evidence presented to the grand jury. As long as his presentation does not run afoul of the legal principles enunciated above, and neither misleads the grand jury nor engages in "fundamentally unfair tactics," no abuse is present. *United States v. Ciambrone,* 601 F.2d at 623. Such is the case here. Although Pomerantz's pedigree might possibly have placed an imprimatur of credibility in some jurors' eyes, most would have found it irrelevant. Furthermore, the grand jury was free to evaluate his testimony and to reject all, part or none of his statements. His professional background was and is totally irrelevant to the issues at hand, except perhaps, to the view that all lawyers make poor witnesses.

■ The defendants further contend that Pomerantz's comments about Ms. Tipograph and Brown's ignorance of a lawsuit filed on his behalf unfairly degraded and placed in doubt the honesty of defense counsel. There is no reason to believe that Pomerantz was not accurately relating his conversation with Brown. *Cf. United States v. Ciambrone,* 601 F.2d at 624 (Court approved of AUSA giving "honest view" of defendant's motive to grand jury). To present Brown's letters in a vacuum would portray a distorted view of the incident and not allow the grand jury to evaluate all relevant evidence surrounding Brown's decision to cease cooperating. For all the above reasons, Pomerantz's testimony before the grand jury does not constitute grand jury abuse.

25, 1981, December 3, 1981, December 13, 1981, December 31, 1981, January 6, 1982, January 8, 1982, January 29, 1982, March 27, 1982, and March 30, 1982.

b.  Brown's mental history

■ Defendants argue that the government's failure to apprise the grand jury of Brown's unstable mental status constituted grand jury abuse.  In a companion opinion filed on March 28, 1983, I have examined these allegations in detail.  In short, little beyond mere speculation has been presented, either in the instant motion papers or at the hearing on the defendants' suppression motions, documenting that government officials knew of Brown's questionable psychiatric condition at any time prior to the filing of the original indictment in this case on April 21, 1982.[2]  Both Agent Cordier and Agent Maxwell testified that Samuel Brown was at times disjointed, dishonest and agitated during their meetings with him.  These facts, however, are insufficient to place the government on notice that Brown suffered from a mental illness that need be disclosed to the grand jury.

■ Implicit in the defendants' argument is their characterization of Brown's mental status as exculpatory.  Even if this characterization is accurate, the government need not aggressively seek out exculpatory evidence, but only present it when known to government officials.  The government's neglect to present to the grand jury what it did not know cannot amount to abuse.  The defendants would have me find that Brown was a raving maniac whose mental condition was obvious to anyone seeing him.  Samuel Brown's appearance before the grand jury further debilitates these contentions of the defendants.  The transcript submitted *in camera* reveals that the grand jury was afforded an opportunity to observe Mr. Brown.

c.  Brown's physical history

Defendants suggest that the grand jury was not informed about the beatings allegedly sustained by Brown at the hands of law enforcement.  The Pomerantz transcript, however, reveals that Brown's March 31, 1982 letters to AUSA Parver set forth the beatings he assertedly suffered and that these letters were read *in toto* to the grand jury.

2.  *Yvonne Thomas*

Defendants' contention that the psychiatric condition of informant Thomas was withheld from the grand jury is easily dismissed.  Grand jury transcripts submitted *in camera* reveal that evidence of Ms. Thomas' medical and psychiatric history was divulged.

3.  *Hearsay Evidence*

■ The defendants' next argument challenges the government submission of hearsay evidence to the grand jury.  The prosecution is entitled to introduce hearsay evidence as long as the grand jurors are not deceived as to "the shoddy merchandise they are getting so they can seek something better if they wish."  *United States v. Payton*, 363 F.2d 996, 1000 (2d Cir.) (Friendly, J., dissenting), *cert. denied*, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966) *quoted in United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972).  This proviso respects the prosecutor's need for flexibility in presenting a case before the grand jury as well as society's need to inform these jurors of the qualitative nature of the evidence being presented.

■ The government continually met its *Estepa* obligations.  The *in camera* submissions reflect again and again the prosecutor's reminder to the grand jury that certain testimony was hearsay and that if first hand testimony was desired, the government would endeavor to so provide.  *Cf. United States v. Schlesinger*, 598 F.2d 722, 726 (2d Cir.), *cert. denied*, 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979) (unnecessary to invoke court's supervisory powers to dismiss indictment when "grand jurors were aware of the nature of the evidence before them and, indeed, were told explicitly that they could 'seek something better if they wish.'  *Estepa* at 1137.").

---

**2.**  The government did not submit any evidence based on Brown's statements after the filing of the initial indictment.  October 21, 1982 Affidavit of Stacey J. Moritz at ¶ 10A.

The defendants next extend their argument and contend that the government cannot be allowed to tell the grand jury that it will endeavor when requested to present first-hand testimony when it knew that Thomas and Brown would refuse to testify. This argument presumes that the government had such knowledge. No evidence has been submitted to me in support of this presumption. Furthermore, in presenting its case to the grand jury, the government promises to do its best to secure first-hand evidence, it does not promise, nor does *Estepa* require that it promise, that all such evidence will be available. In compliance with this promise, for example, Samuel Brown appeared before the grand jury. That Brown refused to testify on that occasion does not preclude testimony about what he had admitted at other times. The rules of evidence, despite defendants' argument to the contrary, are not applicable in the grand jury setting. Thus, hearsay evidence of what Brown had said previously was properly before the grand jury.

### 4. *Freeze Witnesses Testimony*

Defendants broadly accuse the government of "using grand jury subpoenas to freeze witnesses' testimony and to discover defense witnesses' testimony, after the defendants had already been indicted." Defendants' Miscellaneous Pre-Trial Motions at 3–4. This motion was filed on September 17, 1982. Three days later, on September 20, 1982 the government filed a superseding indictment. Subsequent superseding indictments were filed on November 17, 1982, and November 24, 1982. These indictments support the government's position that the continued presentation of evidence to the grand jury was part of a good faith on going investigation. It may well be improper for witnesses to testify before the grand jury after return of the indictment and the end of the investigation. *See United States v. Gibbons,* 607 F.2d 1320, 1328 (10th Cir.1979); *United States v. Fisher,* 455 F.2d 1101, 1104 (2d Cir.1972). The subsequent indictments, however, deflate the defendants' arguments that such improper conduct occurred here. The

government did not abuse the grand jury by attempting to freeze testimony. Accordingly, this basis for dismissal of the indictment is denied.

In sum, there being no evidence of grand jury abuse, the defendants' motion to dismiss the indictment is denied.

SO ORDERED.