UNITED STATES of America, Plaintiff,

v.

SUN MYUNG MOON and Takeru Kamiyama, Defendants.

No. S 81 Cr. 705 (GLG).

United States District Court,
S. D. New York.

March 1, 1982.

---

William M. Tendy, Acting U. S. Atty., S. D. N. Y., New York City, Atty. for plaintiff; Jo Ann Harris, Senior Litigation Counsel, Martin Flumenbaum, Asst. U. S. Atty., New York City, of counsel.

Stillman, Friedman & Shaw, New York City, Caplin & Drysdale, Washington, D. C., for defendant Moon; Charles Stillman, Julian Friedman, New York City, Bernard Bailor, Washington, D. C., of counsel.

Andrew M. Lawler, New York City, for defendant Kamiyama.

## OPINION

GOETTEL, District Judge:

The Reverend Sun Myung Moon is the founder and spiritual leader of the Unification Church, a church with approximately two million members in 120 countries around the world.[1] Takeru Kamiyama is a member of the Unification Church and an advisor to Moon. The Holy Spirit Association for the Unification of World Christianity (HSA–UWC) is the corporate embodiment of the Unification Church in the United States. HSA–UWC was incorporated in 1961 as a California not-for-profit corporation and was granted tax exempt status by the Internal Revenue Service (IRS) in 1963. At the times relevant to the present case, the activities of the Unification Church in New York State were conducted by a separate entity, the Unification Church of New York (UCNY). UCNY began as an unincorporated association and later became incorporated as a New York not-for-profit corporation.[2] HSA–UWC assumed the responsibilities of UCNY in 1976.

On October 15, 1981, a federal grand jury indicted Moon on charges of making and subscribing false federal income tax returns in 1973, 1974, and 1975, conspiracy to file false returns, and conspiracy to obstruct the investigations of these tax returns being conducted by the federal grand jury and the United States Attorney. These charges revolve around checking and savings accounts at the Chase Manhattan Bank, in Moon's name, in which $1.6 million was allegedly deposited from March 1973 through December 1975 and $50,000 of stock in Tong Il Enterprises, a company that imports ginseng tea and other merchandise from Korea. The Government alleges that these accounts and stock were owned by Moon personally and that he failed to report the receipt of this stock and the interest earned on the bank accounts as taxable income on his tax returns. The Indictment also names Kamiyama in the conspiracy and separately charges him with aiding and abetting in the preparation and presentation of Moon's allegedly false tax returns, obstruction of justice, causing false documents to be submitted to the United States Department of Justice, and giving false testimony to the grand jury. On December 15, 1981, the grand jury returned a superseding indictment that adds an additional perjury count against Kamiyama and makes certain changes in the language of other counts.

The defendants have made a number of substantive and procedural motions, many of which have already been decided.[3] Sev-

---

1. Durst Affidavit ¶ 12.

2. Although it is not relevant to the pending motions, we note that there is a discrepancy as to what year UCNY became incorporated. The Indictment alleges that UCNY became incorporated in March 1974. Dr. Durst, the President of HSA–UWC, states that UCNY was incorporated in April 1973.

3. At a pretrial conference on January 15, 1982, the Court denied Moon's motions to dismiss on the ground that this is a selective prosecution, for a severance, for discovery of electronic surveillance, and for a hearing to determine the qualifications of any interpreter appointed by the Court. Moon's motion to suppress any evidence shown to have been obtained illegally was denied in the absence of proof that any evidence had been obtained in an illegal manner. The Court granted in part Moon's motions for discovery, for a bill of particulars, and approving his right to waive an interpreter under

the Court Interpreters Act except when, and if, he testifies as a witness. Although not explicitly denied, the motion for an order pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), directing the government to produce all evidence that is "favorable" to the defendant was denied inferentially because the *Brady* standard is exculpatory evidence, not favorable evidence. The Government is, of course, required to disclose all exculpatory evidence. No order is necessary for this. With respect to Kamiyama, the Court granted in part his motions to appoint an independent interpreter to review the accuracy of the interpretation of the grand jury testimony that is specified in the indictment as being perjurious, see note 4 *infra*, for discovery, for a bill of particulars, and for an order approving his waiver of an interpreter under the Court Interpreters Act. The Court denied his motion to dismiss for selective prosecution.

The defendants withdrew their motions to dismiss count one on the ground that it charges as

eral motions remain outstanding. Moon moves to dismiss the tax counts on the ground that they are legally insufficient and to dismiss all the counts on the grounds of prosecutorial misconduct and abuse of the grand jury process. Kamiyama, in addition to joining in Moon's motions, moves to dismiss the perjury counts on the grounds that his answers before the grand jury were not material, that the questioning of him was unfairly tailored to extract inaccurate answers, and that the interpreter in the grand jury proceedings failed to translate his testimony properly.[4]

## I. *The Tax Counts*

The first area of dispute concerns the tax counts of the indictment. Moon moves to dismiss counts two, three, and four, which charge Moon with knowingly and wilfully filing false income tax returns for the years 1973, 1974, and 1975, a violation of 26 U.S.C. § 7206(1) (1976), and count one insofar as it charges a conspiracy to file false tax returns. (Counts two, three, and four all allege that Moon failed to report interest income from various accounts at the Chase Manhattan Bank. Additionally, count two alleges that Moon failed to report income from the receipt of stock in Tong Il Enterprises and that Moon gave a false source for the income declared on his 1973 tax return.) According to Moon, two grounds support dismissal: the legal insufficiency of the taxability theory stated in the indictment and the failure of the prosecutor to instruct the grand jury properly on the applicable

law. Moon also moves to dismiss the false source allegation of count two on the ground that it is legally insufficient. These claims are without merit.

### A. *Legal Sufficiency and the Prosecutor's Instructions*

■ Moon's argument that the tax counts of the indictment are legally insufficient has been mooted by the filing of the superseding indictment. The gist of his argument was that the indictment was invalid on its face because, rather than alleging that Moon had beneficial ownership of the bank accounts and the stock, a prerequisite for taxability, it alleged only that Moon had "dominion and control" over the accounts and that the stock was "issued" to Moon. In view of the language in the superseding indictment that Moon "owned" the accounts and the Tong Il stock, even Moon concedes that "[c]ounts [o]ne through [f]our are now valid on their face." Reply Memorandum in Support of Pretrial Motions of Rev. Sun Myung Moon at 2 (footnote omitted).[5]

■ The Government's decision to alter the language of the indictment, however, has not completely curtailed Moon's contention that the prosecutor's legal instructions to the grand jury on the taxability of income must be scrutinized by the Court. For example, Moon wants to know whether the reasons for changing the language in the indictment were explained to the grand jury and whether ownership was defined as

a single conspiracy what are in fact separate conspiracies and to dismiss on the ground of prosecutorial misconduct insofar as they were premised on the allegation that the prosecutor misrepresented the legal requirements for nominee, agency, or trustee status under the federal tax laws, and that the prosecutor misrepresented what interest had been declared as income on Moon's income tax returns. The Court deems the allegation that the prosecutor attempted to intimidate grand jury witnesses to be withdrawn because it was not addressed in the papers.

4. The Court has appointed an independent Japanese translator to review the disputed translations. The translator has yet to complete her assignment. Rather than delay the decision on

the other motions, the issues relating to the accuracy of the translations will be considered separately.

5. Moon asserts that the Government, by obtaining the superseding indictment, has tacitly admitted that the original indictment was invalid. The Government disputes this point. It argues that the original indictment was valid, for Moon's ownership of the stock and the bank accounts was implicit in the wording of the indictment. According to the Government, the purpose of going back to the grand jury was to clarify several aspects of the perjury counts; as long as a superseding indictment was being sought, however, it seemed logical to clear up any other possible source of confusion.

something less than beneficial ownership. Although this course of action is rarely taken by federal courts (particularly where, as here, the grand jury transcripts amount to several thousand pages), the peculiar circumstances of this case, especially the filing of the superseding indictment, have prompted this Court to review the prosecutor's instructions to the grand jury that returned the superseding indictment. Having done so, however, this Court cannot grant Moon's motion to dismiss, for there is no indication that the grand jury was misled as to the applicable law.

### B. *The False Source*

Moon's arguments regarding the false source allegation are also unconvincing. On the 1973 joint tax return filed by Moon and his wife,[6] line 9 asked for "Wages, salaries, tips and other employee compensation." It also required that the taxpayer attach his W–2 forms or, if unavailable, to provide an explanation. Moon entered the amount of $14,458.41 on line 9. To explain the absence of an accompanying W–2 form, he also attached the following note:

> Because the Unification Church was incorporated in New York only in March of 1974 the books were not clearly established and matters such as W–2's were not yet organized. This happened because in general no one in the Unification Church rec[ei]ves any compensation whatsoever, wages and salaries, and the corresponding forms (W–2's) have never been needed.

The indictment, as clarified by the Government's response to Moon's bill of particulars, charges that this statement falsely identified the Unification Church as the source of Moon's income. Moon argues that

this false source allegation is legally insufficient.

■ The first argument proffered by Moon is that the statement amounted only to an explanation of the absence of an attached W–2 form, not a representation that the Unification Church was the source of the income reported on line 9.[7] This is untenable. A W–2 form indicates the amount of income received from a particular source, and it is prepared by the organization or individual that is the source of the income. The only reasonable inference that can be drawn from the statement that no W–2 forms were attached because the administrative apparatus of the Unification Church was not yet established is that the Unification Church was the source of the income.

Moon's second argument is that, even if this statement amounted to a representation of the source of the income, he cannot be prosecuted because neither the Internal Revenue Code nor the Regulations explicitly require a taxpayer to identify the source of income reported on line 9, but not reflected in a W–2 form. In support of this proposition, Moon cites *United States v. Levy*, 533 F.2d 969 (5th Cir. 1976), in which the Fifth Circuit held that a taxpayer could not be prosecuted under section 7206(1) for making false statements on IRS Form 433–AB because use of the form was not authorized by the Code or the Regulations. *Id.* at 975.

Reliance on *Levy* is misplaced, however, because it does not stand for the proposition that one can be prosecuted under section 7206(1) only if the false statement was made in response to a question specifically authorized by the Code or Regulations.

---

**6.** A copy of this tax return is attached to the Stillman Affidavit as Exhibit A.

**7.** In the alternative, Moon argues that the reference to the Church in the second sentence "could equally well indicate the unincorporated association which beneficially owned the Chase account, and which therefore was the true source for the income reported on line 9." Memorandum of Law in Support of Motions of Rev. Sun Myung Moon to Dismiss the Indictment and for other Pre-trial Relief at 14. Al-

though this argument is difficult to understand, Moon appears to be claiming that the Church is the true source of income in that it was the beneficial owner of the Chase accounts. The Court, however, is not now in a position to state that the Unification Church was the beneficial owner and the true source of the income reported on line 9. This is a factual issue that is properly resolved at trial, not on a motion to dismiss.

This was made clear in *United States v. Taylor*, 574 F.2d 232 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978), a subsequent Fifth Circuit case ignored by Moon. *Taylor* involved a prosecution for false reporting on Schedules E and F of Form 1040. Distinguishing *Levy*, the court rejected the defendant's argument that prosecution was barred because use of the Schedules was not explicitly required by the Regulations. *Id.* at 237. It noted that

> [s]ection 7206(1) pertains to willful subscription to "any return, statement, or other document" made under penalty of perjury. *Levy* involved the question of whether Form 433–AB was a "statement" within the meaning of the statute. We held that "statement" referred only to documents required by the Internal Revenue Code or any lawfully promulgated regulation. Since no statute or regulation authorized the use of Form 433–AB, the IRS could not lawfully require its execution under penalties of perjury.

> The instant case does not involve interpretation of "statement." For each tax year in question defendant filed a Form 1040, which clearly is a "return."

> While there is no explicit requirement in the regulations for the completion and filing of Schedules E and F, it is implicit in required Form 1040 that such schedules, when appropriate, become integral parts of such form and are incorporated therein by reference.

*Id.* (citation omitted).

■ Similarly, this case involves a "return," not a "statement." Like the schedules in *Taylor*, a W–2 form or an explanation of its absence attached to an income tax return becomes part of the return itself. Consequently, any false statement on the form or in the explanation can, if material, form the basis of a prosecution under section 7206(1). A simple hypothetical illustrates that any other conclusion could have anomalous consequences. Assume that John Smith earned $10,000 while employed

by X Corporation and that this information was reflected in a W–2 form. If Smith altered the form to indicate that Y Corporation was the source of the income and if he attached the form to his income tax return, there is little question that Smith could be prosecuted under section 7206(1) if the alteration was material. Under Moon's rationale, however, if Smith did not have a W–2 form and if he attached an explanation indicating that Y Corporation was the source of the income, he could not be prosecuted. Neither logic nor the authorities call for such a result.

The final argument concerns materiality. Moon contends that the statement, if a false representation of the source of income, could not possibly have misled the IRS and, thus, was not material. *See* 26 U.S.C. § 7206(1) (1976) (to constitute a violation of the statute, the false statement must be material). For example, he argues that the IRS could have ascertained that the source of the income reported on line 9 was the Chase accounts simply by contacting the Unification Church. Moreover, according to Moon, the IRS already knew of the accounts in Moon's name because Form 1099, which reports the interest earned on accounts in a bank, was sent to the IRS by Chase each year. This Court disagrees.

■ Although there is no precise definition of materiality in the context of section 7206(1), *see United States v. Goldman*, 439 F.Supp. 337, 344 (S.D.N.Y.1977), several cases suggest that a false statement is material if it potentially could hinder or affect the IRS in carrying out functions such as the verification of the accuracy of a tax return. *See United States v. Taylor, supra*, 574 F.2d at 235; *United States v. Romanow*, 509 F.2d 26, 28 (1st Cir. 1975); *United States v. DiVarco*, 484 F.2d 670, 673 (7th Cir. 1973), *cert. denied*, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974); *United States v. Goldman, supra*, 439 F.Supp. at 344.[8] Only one case, however, *United*

---

**8.** Some courts have deemed matters material if they are necessary to a correct estimate and computation of the taxpayer's income tax. *See*

*United States v. Warden*, 545 F.2d 32, 37 (7th Cir. 1976). There does not, however appear to be a "right" or a "wrong" test. For example,

*States v. DiVarco, supra,* has dealt squarely with the issue raised on this motion. It is contrary to Moon's position. In *DiVarco,* the defendants accurately reported the commissions they earned, but falsely reported the source of the commissions.[9] The district court, *see United States v. DiVarco,* 343 F.Supp. 101 (N.D.Ill.1972), reasoning that the purpose of the statute "is to prosecute those who intentionally falsify their tax returns regardless of the precise ultimate effect that such falsification may have," *id.* at 103, and that the IRS would be hampered in its efforts to check the accuracy of returns if the source of income is falsely stated, *id.* at 103, held that misstating the source of income was a material matter for the purpose of prosecution under section 7206(1). *Id.* at 103–04. The Seventh Circuit affirmed and adopted this reasoning. *United States v. DiVarco, supra,* 484 F.2d at 673.

In light of *DiVarco,* this Court is not prepared to conclude so early in the case that Moon's representation, if false, was not material. Listing the Unification Church as the source of income clearly had a potential negative impact on the administrative operations of the IRS—besides the obvious problems of verification, such a statement concealed the existence of the Chase accounts and the interest they generated. (This, of course, assumes that the representation was false.) Moon's argument that the IRS could not possibly have been misled is based on the erroneous premise that materiality is determined by evaluating the actual effect of the statement on IRS operations. This rationale, if carried to its logical conclusion, would preclude prosecution for a misstatement on a tax return, even if motivated by a desire to avoid taxes illegally, as long as an investigation would have revealed the truth. Such a result would be preposterous. Consequently, it is the poten-

tial, not actual, effects that control the issue of materiality. *See United States v. Romanow, supra,* 509 F.2d at 28 (falsehood material even though IRS did not use the information). For example, an understatement of income is not immaterial because the IRS could have ascertained the correct amount by contacting the source of the income. Similarly, a misstatement of interest income from a bank account is not rendered immaterial by the bank's submission of Form 1099 to the IRS.

## II. *Prosecutorial Misconduct*

The defendants make several allegations of prosecutorial misconduct.[10] Moon alleges that the Government improperly failed to present certain exculpatory evidence to the grand jury and abused the grand jury process because, on occasion, it used separate grand juries. Kamiyama also alleges that it was an abuse of the grand jury process to use separate grand juries, particularly where perjury is charged by a grand jury other than that which heard the testimony. In addition, he argues that the Government improperly laid a "perjury trap" by not attempting to refresh his recollection concerning the events about which he allegedly committed perjury. These motions are denied.

### A. *Exculpatory Evidence*

Moon complains about the Government's decision not to call before the grand jury certain Church leaders who had submitted affidavits to the Justice Department regarding their knowledge about the purpose of the monies deposited in the Chase accounts and the funds used to purchase ginseng tea for Tong I1 Enterprises. (In June 1981, while the investigation was in progress, defense counsel submitted a binder of nineteen affidavits from individuals

---

9. That the misstatement in *DiVarco* did not concern the "Wages, salaries, tips, and other employee compensation" line on the income tax return is of no importance.

10. Some of the allegations of misconduct have been withdrawn. *See* note 3 *supra.*

both tests have been used in the same circuit, compare *United States v. Warden, supra, with United States v. DiVarco, supra,* and one circuit has implied that either test is acceptable. *See United States v. Romanow, supra,* 509 F.2d at 28. It appears that the factual situation determines the test to be used.

who, according to Moon, would corroborate his claims. Seven of these nineteen individuals were subpoenaed to appear before the grand jury. Moon claims that nine others should also have testified.) Because of this decision, Moon argues that the indictment must be dismissed. We disagree.

The Second Circuit defined the prosecutor's obligation to present exculpatory evidence to a grand jury in *United States v. Ciambrone*, 601 F.2d 616 (2d Cir. 1979). Noting that " '[a] grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated,' " *id.* at 622 (quoting *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974)), the court ruled that "[d]espite recent movement for revision of grand jury procedure, a prosecutor is not presently obligated to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury." *Id.* (footnote omitted). The Second Circuit went on to note, however, that when "a prosecutor is aware of any substantial evidence negating guilt he should, in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the [grand] jury not to indict." *Id.* 601 F.2d at 623; *see United States v. Boffa*, 89 F.R.D. 523, 530 (D.Del. 1981) (prosecutor may have obligation to disclose evidence that "might reasonably be expected to lead the [grand] jury *not to indict*"); *United States v. Deerfield Specialty Papers, Inc.*, 501 F.Supp. 796, 804–05 (E.D.Pa.1980) (prosecutor not required to present testimony that would merely present issues of credibility and could not be expected to lead the grand jury not to indict).

■ There is no requirement that the prosecutor disclose the allegedly exculpatory evidence in the manner preferred by the defendant. "An indictment is not defective because the defendant did not have an opportunity to present his version of the facts before the grand jury." *United States v. Ciambrone, supra*, 601 F.2d at 623. All that is required of the prosecutor is that he make the exculpatory evidence "known" to the grand jury. *Id.; United States v. Boffa, supra*, 89 F.R.D. at 530.

■ Moon has made no showing that the Government did not make the information contained in these affidavits known to the grand jury or, more importantly, that the testimony of these additional witnesses might reasonably have been expected to lead the grand jury not to indict. The specific individuals in question are Takeko Hose, David Kim, Hideo Oyamado, Ken Sudo, Dennis Orme, Martin Porter, Teddy Verheyen, Reiner Vincenz, and Woo Ukman Cho. The substance of their proffered testimony is summarized in affidavits submitted with this motion. Hose and Kim state that they would have testified that, at a meeting of Church leaders in San Francisco in 1972, Mitsuharu Ishii, a founding member and Treasurer of the Unification Church of Japan, suggested that bank accounts be opened in Moon's name to facilitate fundraising. Oyamado and Sudo state that a similar suggestion was made at a meeting in Japan a few months after the San Francisco meeting. Orme, Porter, Verheyen, and Vincenz, European leaders of the Church, state that they would have testified that they gave money to Kamiyama to help finance Church activities in the United States. Cho states that, if subpoenaed, he would have testified that he received $200,000 in United States currency from Takahiro Shimba, Mitsuharu Ishii's assistant, and that these funds came from Church members to start a ginseng importing business in the United States.

Affidavits submitted by the Government establish that the substance of this proffered testimony had been presented to the grand jury. The Government marked the affidavits these individuals submitted to the Justice Department as a grand jury exhibit. In addition, other witnesses had testified on these matters. With respect to the meetings in 1972 in San Francisco and Japan, the Government states that four witnesses testified before the grand jury regarding these meetings. With respect to the affidavits from European leaders of the Church,

the Government states that three witnesses testified regarding these same matters, including Kamiyama, the person who allegedly received this money. With respect to the testimony of Woo Uk-man Cho, the Government states that this subject was covered by the testimony of four witnesses including Mitsuharu Ishii, the person who purportedly directed Mr. Shimba to give Cho the $200,000.

Moon's contention that the testimony of these witnesses might reasonably have been expected to lead the grand jury not to indict is also unacceptable. The critical issue before the grand jury was whether Moon considered and treated the funds in the Chase Manhattan Bank and the Tong I1 stock as his own. The genesis and purpose of these funds bear only circumstantially on this issue. A jury could well find that Moon treated these funds as his own even though they were originally intended to be for the benefit of the Church. It is also of significance that defendant Moon refused the Government's invitation to testify before the grand jury. *See United States v. Ciambrone, supra,* 601 F.2d at 625; *United States v. Loften,* 518 F.Supp. 839, 857 n.30 (S.D.N.Y.1981); *United States v. Deerfield Specialty Papers, Inc., supra,* 501 F.Supp. at 805 n.10.

Finally, it should be noted that the cases cited by Moon in which indictments were dismissed for failure to present exculpatory evidence are inapplicable.[11] Those cases involved allegations of the prosecutor misleading the grand jury. The thrust of Moon's claim is that the additional witnesses are more credible than those who testified before the grand jury. This is not a proper ground to attack an indictment returned by a legally constituted grand jury. To require the Government to present the defendant's choice of witnesses to the grand jury would "convert a grand jury proceeding from an investigative one into a mini-trial of the merits." *United States v. Ciambrone, supra,* 601 F.2d at 222; *see United*

States *v. Deerfield Specialty Papers, Inc., supra,* 501 F.Supp. at 805. That is not the function of the grand jury.

**B.  Separate Grand Juries**

Relying on the debriefings of four church members who had appeared before a grand jury on several occasions, Moon contends that the Government made simultaneous use of multiple grand juries and argues that there is no assurance that the grand jury that returned the indictment heard evidence from which it could conclude that there was probable cause to believe that Moon had committed a crime. Thus, argues the defendant, the Court should dismiss the indictment or, in the alternative, direct disclosure of the grand jury minutes. This contention is without legal or factual merit.

It is elementary that "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for [a] trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) (footnote omitted). A court need not look behind a facially valid indictment to consider the character of the evidence upon which it is based. *United States v. Calandra, supra,* 414 U.S. at 344–45, 94 S.Ct. at 618; *United States v. Schlesinger,* 598 F.2d 722, 726 (2d Cir.), *cert. denied,* 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). Concededly, a court may dismiss an indictment under its supervisory powers over the administration of justice when, for example, "there is a high probability that the grand jury would not have indicted if presented with first-hand testimony rather than hearsay or where the prosecution has misled the grand jury as to the 'shoddy merchandise they are getting.'" *Id.* at 726; *see United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir. 1972). These supervisory powers, however, are quite limited. *United States v. Myers,* 510 F.Supp. 323, 328 (E.D.N.Y.1980). Dismissal of an indictment is a "*most drastic remedy,*" *United*

---

11. The defendant cites *United States v. Lawson,* 502 F.Supp. 158, 172 (D.Md.1980); *United States v. Provenzano,* 440 F.Supp. 561 (S.D.N.Y.1977); and *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610 (N.D.Okl.1977).

*States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978) (emphasis in original), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), that should not be granted absent extraordinary circumstances. *See United States v. Artuso*, 618 F.2d 192, 196–97 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980); *United States v. Brown*, 602 F.2d 1073, 1076–77 (2d Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979); *United States v. Ciambrone, supra*, 601 F.2d at 623, 625 n.6; *United States v. Schlesinger, supra*, 598 F.2d at 726.

There is nothing in the papers to suggest that the Government relied extensively on hearsay testimony or that the grand jury might not have indicted Moon had a witness who testified before a separate grand jury testified in person. Given the length of the investigation and the number of witnesses who appeared before the grand jury, one would expect that more than one grand jury would be used. The Government states in its opposing affidavit that approximately ninety-five percent of the witnesses appeared before the grand jury that voted the indictment. Moreover, the Government states that the testimony of each witness who appeared before a separate grand jury was marked as an exhibit and read in its entirety before the grand jury that voted the indictment. In addition, it states that the grand jury was instructed regarding its right to hear first hand testimony. In short, Moon has made no showing to justify dismissal or disclosure of the grand jury minutes.

Kamiyama bases his claims regarding the use of separate grand juries on different grounds. Although his motion raises somewhat novel issues, it too must be denied.

Kamiyama initially appeared before the grand jury on March 31, 1981 and invoked his Fifth Amendment privilege after learning that he would not be given immunity. This appearance was before the June 1980 Additional Grand Jury, the grand jury that returned the indictment (indicting grand jury). In June 1981, Kamiyama filed a nine page affidavit in support of Moon's submission to the grand jury by which he sought to avoid indictment. He then testified before the grand jury on the mornings and afternoons of July 9, July 16, and July 21, 1981. His testimony on the morning and afternoon of July 9 and the afternoon of July 21 was before the indicting grand jury. His testimony on the morning and afternoon of July 16 and the morning of July 21 was before the July 1981 Regular Grand Jury (substituting grand jury). The Government states that Kamiyama's testimony before the substituting grand jury was read in its entirety to the indicting grand jury prior to the issuance of the indictment.[12]

Kamiyama raises two claims regarding the use of separate grand juries. He argues that this procedure violated his due process rights because the grand jury that issued the indictment did not have the opportunity to evaluate his demeanor and, thus, could not competently assess the truthfulness of any given answer. With respect to counts eleven, twelve and thirteen, which are based upon testimony given before the substituting grand jury, Kamiyama argues that these counts must be dismissed because this testimony was not material to the grand jury before which it was given, that is, because the substituting grand jury was not investigating Moon's activities, Kamiyama's allegedly perjurious statements could not have been material to it.[13]

12. The Government states that Kamiyama testified before the substituting grand jury on July 16, 1981 because the indicting grand jury had planned a vacation for the week of July 13, 1981. The Government also explains why Kamiyama testified before separate grand juries on July 21, 1981. At the conclusion of the morning session, which was conducted before the substituting grand jury, the foreperson directed Kamiyama to return the next week. Kamiyama requested to complete his testimony that day. To accomodate him, the Government managed to obtain time before the indicting grand jury, which had just returned from vacation.

13. Kamiyama also makes several other materiality arguments concerning counts nine, ten,

Both of these arguments are specious. Common sense dictates that there is no requirement that the perjury occur before the grand jury that issues the indictment. The crime of false declarations before a grand jury or court extends to "*any* proceeding before or ancillary to *any* court or grand jury of the United States." 18 U.S.C.A. § 1623(a) (Supp.1981) (emphasis added). There is no question that if a witness testifies falsely in a proceeding in the district court, a grand jury can issue a perjury indictment even though it did not have an opportunity to observe his demeanor on the witness stand.[14] Similarly, if a prosecutor does not discover that a grand jury witness committed perjury until after the grand jury before whom the witness testified has been disbanded, there is no question that another grand jury can indict the witness for perjury.

Common sense also dictates that we reject Kamiyama's claim regarding the materiality of his allegedly false statements. Although Kamiyama's statements to the substituting grand jury technically were not material to any investigation then being conducted by *that* grand jury panel, this does not entitle him to testify falsely. Section 1623(a) extends to proceedings ancillary to those of the grand jury. When Kamiyama testified before the substituting grand jury, it was acting in an ancillary capacity. *See generally Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); *United States v. Tibbs*, 600 F.2d 19 (2d Cir. 1979). His allegedly false statements to that grand jury, therefore, come within the scope of section 1623(a).[15]

### C. *"Perjury Trap"*

Kamiyama argues that the Government had a duty to attempt to refresh his recollection concerning the events surrounding his allegedly perjurious testimony because the Government knew the answers to the questions propounded to him. He argues, in effect, that the Government laid an impermissible "perjury trap." Having considered the various affidavits and exhibits submitted in connection with this motion, the Court concludes that there is no basis for Kamiyama's claim.

It is well settled that the Government has no obligation to advise a witness that he is committing perjury or to warn a witness that he has a right to recant his testimony. *See United States v. Mandujano*, 425 U.S. 564, 580–84, 96 S.Ct. 1768, 1778–1780, 48 L.Ed.2d 212 (1976); *United States v. Del Toro*, 513 F.2d 656, 664–66 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Cuevas*, 510 F.2d 848, 851–52 (2d Cir. 1975); *United States v. Lardieri*, 506 F.2d 319, 322–24 (3d Cir. 1974). Nor does the Government have a duty to advise a witness of what evidence it has or to give repetitive instructions to the witness that he has an obligation to tell the truth. *United States v. Del Toro, supra*, 513 F.2d at 664; *see United States v. Winter*, 348 F.2d 204, 210 (2d Cir.), *cert. denied*, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

Conceding these legal principles, Kamiyama argues that the Government does have a threshold obligation, before seeking a perjury indictment, to take reasonable steps to insure that an erroneous answer by a witness is in fact an intentional lie and not merely a mistake or the product of a faulty memory. His exclusive legal support for this argument is a decision from the New York Court of Appeals, *People v.*

twelve, and thirteen. These claims are considered in pt. III *infra*.

**14.** In this case, moreover, the indicting grand jury had ample opportunity to observe the defendant's demeanor over the course of his day and a half of testimony before it.

**15.** Kamiyama argues that if the substituting grand jury was ancillary to the indicting grand jury, then the indictment is technically deficient because it charges Kamiyama with perjury "before" the grand jury rather than "in a proceeding ancillary to" the grand jury. We see little to this argument. The fact that a grand jury is acting ancillary to another does not make it any the less a grand jury proceeding. A grand jury is still a grand jury.

*Tyler*, 46 N.Y.2d 251, 385 N.E.2d 1224, 413 N.Y.S.2d 295 (1978).

*Tyler* is clearly distinguishable from the case at bar. An obvious distinction is that *Tyler* involved an interpretation of state, not federal, law. More importantly, *Tyler* involved a situation in which the questioning was not intended to further the investigation, but instead was designed to trap the witness into giving false testimony. 46 N.Y.2d at 259, 385 N.E.2d at 1229, 413 N.Y. S.2d at 300. In this case, defendant Kamiyama concedes that he was an appropriate grand jury witness and does not contend that the Government's purpose in calling him was to trap him into committing perjury. Indeed, he inserted himself into the proceedings by submitting various claims designed to influence the grand jury against indicting Moon. The cases are also distinguishable by the relevancy of the matters that form the basis of the perjury counts. The witness in *Tyler* was questioned about "minor outward details of a single meeting." 46 N.Y.2d at 260, 385 N.E.2d at 1229, 413 N.Y.S.2d at 300. The perjury counts in this case involve issues of importance to the grand jury investigation, *see* pt. III *infra*. Had the grand jury not interrogated him, it would have given rise to a much stronger claim that the prosecution had failed to present to the grand jury clearly exculpatory evidence as to the Moon tax evasion investigation.

▮ Kamiyama also argues that the Government had a special obligation to refresh his recollection because the events about which he testified occurred eight years prior to his grand jury appearance. We cannot accept this contention under the circumstances of this case. The Government had notified the defendant in the early spring of 1981 that he was a target of a grand jury investigation. In June 1981, just one month prior to his grand jury appearance, Kamiyama submitted to the Government an affidavit concerning the matters that form the basis for counts nine and ten of the indictment. This simply is not a situation in which an unsuspecting witness is trapped by questions concerning insignificant events in the past. *Cf. United States v. Phillips*, 540 F.2d 319, 322 n.8 (8th Cir.) (indictment not dismissed when Government neither solicited nor encouraged the alleged perjury), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976); *United States v. Nickels*, 502 F.2d 1173, 1176 (7th Cir. 1974) (same), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976).

## III. *Materiality of the Perjury*

▮ Kamiyama has also moved to dismiss counts nine, ten, twelve, and thirteen on the ground that the allegedly false answers were not material to the grand jury's inquiry, a *sine qua non* of a perjury charge. Initially, a few general observations regarding materiality are in order. Because of the investigative function of grand juries, the concept of materiality in the context of a grand jury inquiry is quite broad and liberally construed. *United States v. Berardi*, 629 F.2d 723, 728 (2d Cir.), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); *accord, United States v. Byrnes*, 644 F.2d 107, 111 (2d Cir. 1981). Thus, the Second Circuit in *Berardi* stated that

> [m]ateriality is . . . demonstrated if the question posed is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are weighed in terms of potentiality rather than probability. Thus, in applying this gauge to specific situations, it is only the question, at the time of its asking, which is considered. It is of no consequence that the information sought would be merely cumulative, that the response was believed by the grand jury to be perjurious at the time it was uttered, or that the matters inquired into were collateral to the principal objective of the grand jury.

*United States v. Berardi, supra*, 629 F.2d at 728 (citations omitted).[16]

---

**16.** The materiality of the alleged perjury is a question of law to be resolved by the Court.

*United States v. Berardi, supra*, 629 F.2d at 728.

It should also be emphasized that, on this motion to dismiss the indictment, the Court is deciding only whether "the facts alleged in the indictment are sufficient to charge a crime under the applicable statute." *United States v. Steinschreiber*, 218 F.Supp. 426, 427 (S.D.N.Y.1962). In this instance, that means whether the specifications of perjury bear upon the issues that the indictment alleges were material to the grand jury's investigation. *See United States v. Ponti- celli*, 622 F.2d 985, 989 (9th Cir.), *cert. de- nied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980) ("'the materiality re- quirement of a perjury indictment may be met by a general statement that the matter was material'" (quoting *United States v. Davis*, 548 F.2d 840, 845 (9th Cir. 1977))); *United States v. Hilliard*, 436 F.Supp. 66, 71 (S.D.N.Y.1977) (when "the perjury charged 'as appears upon the face of the indictment' is 'within the realm of materiality,' whether the accused testimony was material to the grand jury's inquiry is a matter that must be deferred until the close of the Govern- ment's case). With these principles in mind, we now turn to Kamiyama's specific contentions.

#### A. *Counts Nine and Ten*

Kamiyama's first point concerns counts nine and ten. Count nine alleges that Ka- miyama made the following false declara- tions in response to questions relating to Moon's ownership of Tong I1 stock. (The allegedly false declarations are underlined.)

Q. Did Reverend Moon know he owned stock in Tong I1, that stock was in his name in Tong I1?

A. *I doubt it, because I took it up by myself and did all what I had to do. So I don't think he knew it.*

Q. Did you tell Reverend Moon that you had issued $50,000 worth of stock in his name?

A. *No, I never mentioned it.*

Q. Never discussed it with him?

A. *No. It was like my simply borrow- ing his name, and I did execute it.*

Q. Did Reverend Moon sign any docu- ments in connection with his ownership of stock in Tong I1?

A. *No, there was no such occasion.*

Q. And you never talked to him about it?

A. *That is correct,* and nothing of the specific day-to-day office work.

Count ten alleges that Kamiyama made the following false declarations relating to the Chase bank accounts in Moon's name. (The allegedly false declarations are underlined.)

Q. Did Reverend Moon carry the check book with him?

A. *He doesn't, because I managed it.*

Q. You carried the check book with you from the very beginning of the account?

A. *Yes, I kept it myself from the be- ginning.*

Q. Did you sign any of the checks for Reverend Moon's account?

A. I never signed it myself, although I asked him for signature, and I made a request, but I never signed myself.

Q. Reverend Moon signed all the checks?

A. That's correct.

Q. And did Reverend Moon write out the other portions of the check other than his signature?

A. *No, no, he didn't do it.*

Q. You prepared all the checks for him?

A. *That's correct.*

\* \* \* \* \* \*

Q. Did Reverend Moon ever write any portion of the checks on the Chase Man- hattan account other than his signature?

A. *He never wrote anything other than his own signature as far as I remem- ber.*

\* \* \* \* \* \*

Q. So, to your knowledge, he never wrote anything but the signature; is that correct?

A. *To the best of my knowledge, Re- verend never affixed anything other than the signature in the book, in the check.*

\* \* \* \* \* \*

Q. We are talking about the Chase Manhattan checking account which was opened solely in his name; is that clear?

A. Yes, that's correct.

Kamiyama proffers two related, if not substantially identical, theories to support his argument that these questions and answers were immaterial to the grand jury's inquiry. First, he argues that the grand jury's investigation could not have been helped or hindered by his response to these questions, *see United States v. Berardi, supra*, 629 F.2d at 728, because there was no real dispute as to whether Moon signed documents relating to Tong I1 or whether Moon ever wrote more than his signature on the checks. (Prior to Kamiyama's testimony, the grand jury received copies of checks drawn on the Chase accounts and a copy of the Tong I1 stock subscription offer bearing Moon's name and signature. Additionally, a handwriting expert concluded that the handwriting on certain checks was that of Moon.) Second, he argues that his answers were not material because the questions posed to him sought information already possessed by the grand jury. Neither argument is sufficient to dismiss these counts of the indictment.

■ As the Government notes in its papers, the grand jury had a broad mandate to determine whether Moon and Kamiyama had violated federal law. In particular, the grand jury was interested in information concerning the defendants' role, knowledge, and involvement in the Chase accounts, in Tong I1 Enterprises, and in the preparation of Moon's tax returns. *See* Indictment ¶¶ 26, 30. It seems clear, therefore, that these inquiries cannot be deemed immaterial to the grand jury's investigation. Kamiyama's argument that the grand jury's investigation could not have been hindered because these particular facts were not in dispute is specious. When Kamiyama testified that Moon never signed documents relating to Tong I1 and that Moon wrote only

his signature on the checks, the grand jury was entitled to believe his testimony. If they did so and if his statements were false, "the natural effect would have been to impede the grand jury's investigation." *United States v. Carson*, 464 F.2d 424, 436 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972).

■ Kamiyama's second theory is not supported by the authorities.[17] That the grand jury has evidence contradicting the witness's testimony does not render that testimony immaterial. In *United States v. Carson, supra*, for example, the defendant was convicted of perjury as a result of his statement before the grand jury that he had never met particular individuals. Reasoning that other testimony heard by the grand jury was irrelevant to a determination of materiality, the Second Circuit held that the testimony was material despite the grand jury's possession of tape recordings that clearly showed that the defendant had met these people. *Id.* at 436; *accord, United States v. Williams*, 552 F.2d 226, 230 (8th Cir. 1977); *United States v. Phillips, supra*, 540 F.2d at 328; *United States v. Lee*, 509 F.2d 645, 646 (2d Cir.) (per curiam), *cert. denied*, 422 U.S. 1044, 95 S.Ct. 2645, 45 L.Ed.2d 696 (1975).

### B. *Counts Twelve and Thirteen*

The second aspect of Kamiyama's challenge to the perjury counts of the indictment concerns counts twelve and thirteen. Count twelve alleges that Kamiyama made the following false declarations. (The allegedly false declarations are underlined.)

Q. Let me show what has been marked—before I do that—in January 1974 you bought $100,000 worth of stock in Tong I1; correct?

A. Yes.

Q. And you got that hundred thousand dollars from the family fund?

---

17. None of the cases cited by Kamiyama to support his theory involved grand juries. *See United States v. Crawford*, 395 F.Supp. 800 (W.D.Pa.1975) (preliminary hearing before a magistrate); *United States v. Provinzano*, 333 F.Supp. 255 (E.D.Wis.1971) (I.R.S. administrative investigation); *United States v. Cross*, 170 F.Supp. 303 (D.D.C.1959) (Congressional committee); *United States v. Icardi*, 140 F.Supp. 383 (D.D.C.1956) (same).

A. *Correct.*

Q. Did you tell Reverend Moon that you were buying additional stock in Tong I1 at that time?

A. *No, I didn't.*

Q. Did you discuss with him the reason why you were buying stock in Tong I1?

A. *I don't dare consult with him on such matters.*

Q. Did you ask him if it was proper for you to own more stock in Tong I1 than Reverend Moon?

A. *No, I didn't talk with him about it.*

Q. Did you have any conversations with anyone as to whether or not it was proper for you to own more shares of stock in Tong I1 than Reverend Moon?

A. *I didn't even think about it a bit.*

\*   \*   \*   \*   \*   \*

Q. I was asking about your $100,000 investment in January 1974.

Were there any other reasons for that investment other than the fact that Tong I1 needed money?

A. *I still believe that we needed it for the expansion of the enterprise and if you are still insisting naming down any other reasons, I am afraid I can't find any of these.*

Q. As you sit here, do you recall any other reason other than an investment in Tong I1?

A. *At any rate I still insist that for the sake of expansion, I did so and I can't remember any other.*

Q. Were you having any immigration problems at the time?

A. *No. I didn't experience problems with them.*

Q. Did you purchase the shares in Tong I1 in order to enable yourself to obtain—in order to enable you to stay in the United States for a longer period of time?

A. May I have a word with my counsel?

\*   \*   \*   \*   \*   \*

Q. Did you make your investment in Tong I1 in part for the purpose of obtaining the right to stay in the country for a longer period of time?

A. *I want you to know, sir, that I did that investment for purely—for expansion of Tong I1 Enterprises.*

Q. And your visa or immigration matters did not enter into that at all; is that correct?

A. *I took that step purely for the expansion of Tong I1 Enterprise.*

Count thirteen alleges that Kamiyama made the following false declarations. (The allegedly false declarations are underlined.)

Q. Did you ever tell Michael Warder to tell government investigators that he got $5,000 to purchase stock in Tong I1 from relatives or friends? Did you ever tell him to give that explanation to anyone?

A. *I didn't do it.*

Q. Did you ever tell Mike Warder to give a false explanation as to how he paid for his stock in Tong I1?

A. *No, I didn't.*

▇ Kamiyama argues that these questions and answers were immaterial to the grand jury's investigation. This Court cannot agree. The questions clearly bear upon subjects alleged to have been material to the grand jury's investigation, that is, the defendants' role, knowledge, and involvement in the Chase accounts, in Tong I1 Enterprises, and in the preparation of Moon's tax returns. *See* Indictment ¶¶ 38, 42. Count twelve concerns Kamiyama's purchase of Tong I1 stock in 1974, the reasons for the purchase, and Moon's knowledge of these reasons. It is quite reasonable to accept the Government's argument that these questions were relevant to Moon's involvement with Tong I1, Moon's purchase of Tong I1 stock in 1973, the defendants' intent, the use of the funds for personal gain, the source of funds available to Moon and Kamiyama, and other possible violations of federal law. Count thirteen concerns Kamiyama's alleged attempt to have another Tong I1 stockholder, Michael Warder, lie to government investigators about the source of the funds that Warder

used to purchase Tong I1 stock. It would be untenable to characterize this question concerning a possible attempt to obstruct the investigation as immaterial.

Kamiyama makes an additional argument concerning one question and answer in count twelve. In response to the question, "[d]id you have any conversations with anyone as to whether or not it was proper for you to own more shares of stock in Tong I1 than Reverend Moon," Kamiyama said "I didn't even think about it a bit." He now argues that this specification of perjury must be dismissed.

The first ground for dismissal advanced by Kamiyama is that the answer was not responsive to the question and, thus, under *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), cannot form the basis of a perjury charge. The Supreme Court in *Bronston*, however, held only that one could not be convicted of perjury for an answer that is *literally true but unresponsive* and arguably misleading by negative implication. *Id.* at 353, 357, 93 S.Ct. at 599. Even if it is assumed that Kamiyama's answer was unresponsive, the Court cannot, on the basis of the information before it at this time, conclude that the answer was literally true. Of course, if such a showing is made at a later point, the specification will be dismissed.

Kamiyama's alternative argument is that, even if the answer was responsive, his answers immediately following, but not included in the indictment, show that the grand jury could not have been misled, thereby rendering the testimony immaterial. According to Kamiyama, his "subsequent testimony made it clear that he answered from a memory [that] had dimmed with the passage of time and that while he remembered no need for such a conversation he did not intend to preclude the possibility that he had spoken to any one of several people about the subject matter back in 1974." Memorandum of Law on Behalf of Defendant Takeru Kamiyama at 48. Although it is plausible to argue that Kamiyama did not intend to preclude the possibility that he had discussed the subject with others, this Court does not believe that a materiality issue is raised. His subsequent testimony "fudges" the prior answer a bit, and appears evasive. After hearing the Government's evidence at trial, the court will be in a better position to determine whether there is enough to go to the jury. This involves Kamiyama's intent and whether the statement was in fact false— issues that should be resolved at trial, not on this motion to dismiss.

CONCLUSION

Thus, with the exception of Kamiyama's motion regarding the accuracy of the translations during the grand jury proceedings, see note 4 *supra*, the defendants' motions are denied. Trial will commence on March 22, 1982.

SO ORDERED.